[No. S055881. Aug. 27, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
ANGEL JAIME MONGE, Defendant and Appellant.

## COUNSEL

David H. Pierce and Clifford Gardner, under appointments by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Susan D. Martynec, Pamela C. Hamanaka, Jaime L. Fuster and Carl N. Henry, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**CHIN, J.**—In this case, we consider the applicability of the state and federal prohibitions against double jeopardy to a proceeding to determine the truth of a prior conviction allegation. We conclude that, in this noncapital case, the state and federal prohibitions against double jeopardy do not apply. Accordingly, we reverse the judgment of the Court of Appeal to the extent that judgment bars retrial of the prior conviction allegation on double jeopardy grounds.

### FACTS AND PROCEDURAL BACKGROUND

During the afternoon of January 25, 1995, as Pomona Police Department undercover officers were driving an unmarked car on West Ninth Street in the City of Pomona, they spotted a 13-year-old boy standing near the curb. The boy motioned the officers to pull over, but instead they pulled into an alley that led to the rear of an apartment complex where police had earlier observed narcotics activity. Once in the carport area at the rear of the complex, the officers spotted defendant Angel Jaime Monge. Defendant approached the car, and one of the officers rolled down the window and asked where he could buy marijuana. Defendant did not answer, but walked to a carport. The officers turned their car around and then noticed the young boy who had earlier motioned them to pull over, now standing some distance

behind their car. Defendant returned and gave the boy several plastic bags. The boy then approached the officers and asked how much they wanted. The officers requested two "dime bags" and exchanged two $10 bills for two plastic bags of marijuana. After leaving the alley, the officers reported the sale to other Pomona officers, who arrested defendant and the boy. Police searched defendant and found the two $10 bills that the officers had given to the boy.

The District Attorney of Los Angeles County charged defendant with using a minor to sell marijuana (Health & Saf. Code, § 11361, subd. (a)), sale or transportation of marijuana (Health & Saf. Code, § 11360, subd. (a)), and possession of marijuana for sale (Health & Saf. Code, § 11359). The district attorney also alleged defendant had suffered a prior serious felony conviction within the meaning of the "Three Strikes" law (Pen. Code, §§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)),[1] and a prior prison term within the meaning of section 667.5, subdivision (b). Specifically, the district attorney alleged a July 2, 1992, conviction and prison term for assault with a deadly weapon (§ 245, subd. (a)(1)). Defendant pleaded not guilty and denied all sentencing allegations.

Defendant waived his right to a jury trial of the prior conviction and prior prison term allegations, and the court granted his request to bifurcate determination of those allegations. A jury found defendant guilty of the substantive charges. When proceedings reconvened the following week, the court asked defense counsel if defendant wanted to admit the prior conviction, and defense counsel said, "That's correct, Your Honor." The court then asked defendant if he understood, and defendant said, "Yes." After an off-the-record discussion, the court again asked if defendant wanted to admit the prior conviction, and defense counsel said, "No, he doesn't. He wishes the court to try the prior without the jury."

The prosecutor asserted that the prior assault conviction was a serious felony for purposes of the Three Strikes law. Defense counsel disagreed, arguing the weapon involved in the prior crime was not a deadly weapon. The court interrupted to point out that defendant had pleaded guilty to assault with "a deadly weapon" and thus had admitted the weapon was deadly. The court stated it would take judicial notice of the prior conviction and asked if the parties submitted the matter on that evidence alone. The prosecution then offered as additional evidence a "prison packet" (see § 969b) dated February 17, 1995, and an abstract of judgment. This additional evidence characterized defendant's prior conviction as "PC 245(a)(1) ADW GBI" and "ASLT W/DW (245(a)(1)PC)." Defense counsel submitted

---

[1]All further statutory references are to the Penal Code.

the matter after questioning whether the prosecution's documentary evidence, which included a photograph and fingerprints, related to defendant.

The court found true that defendant suffered a prior serious felony conviction, "[t]he felony being personal use of a deadly weapon in violation [of] section 245, 245(a)(1)." The court also found true the prior prison term allegation. The court imposed an eleven-year sentence, including five years for using a minor to sell marijuana, which the court doubled to ten years under the Three Strikes law (§§ 667, subd. (e)(1), 1170.12, subd. (c)(1)), plus a one-year enhancement for the prior prison term (§ 667.5, subd. (b)) and two years to run concurrently for possessing marijuana for sale. Under section 654, the court stayed the sentence for defendant's conviction of selling marijuana.

On appeal, defendant challenged the Three Strikes law as a violation of his right to due process. On its own motion, the Court of Appeal requested supplemental briefing on whether sufficient evidence supported the trial court's finding that defendant had suffered a prior serious felony conviction within the meaning of the Three Strikes law. Under the Three Strikes law, a prior felony conviction may affect the sentence for the present offense if the conviction was of a "serious felony" as defined in section 1192.7, subdivision (c). (§§ 667, subd. (d)(1), 1170.12, subd. (b)(1).) Of the felonies and categories of felonies listed in section 1192.7, subdivision (c), defendant's July 2, 1992, felony conviction might have qualified as a "serious felony" under either subdivision (c)(8), which refers to "any . . . felony in which the defendant *personally* inflicts great bodily injury on any person, other than an accomplice . . ." (italics added), or subdivision (c)(23), which refers to "any felony in which the defendant *personally* used a dangerous or deadly weapon." (Italics added.)

The Court of Appeal affirmed defendant's conviction, but reversed the trial court's true finding on the prior serious felony allegation, holding the evidence insufficient to establish that defendant had acted personally. In addition, the Court of Appeal held that the state and federal constitutional protections against double jeopardy barred retrial of the prior serious felony allegation. Thus, the Court of Appeal remanded for resentencing.

We granted review in order to consider whether the state and federal prohibitions against double jeopardy apply to a proceeding, in a noncapital case, to determine the truth of a prior serious felony allegation.

DOUBLE JEOPARDY

*Federal Constitution*

The Fifth Amendment of the United States Constitution provides that "[n]o person shall . . . be subject for the same offence to be twice put in

jeopardy of life or limb . . . ." Among other things, this constitutional guaranty, known as the double jeopardy clause, "protects against a second prosecution for the same offense after acquittal." (*North Carolina* v. *Pearce* (1969) 395 U.S. 711, 717 [89 S.Ct. 2072, 2076, 23 L.Ed.2d 656] (*Pearce*), fn. omitted.) In *Benton* v. *Maryland* (1969) 395 U.S. 784, 796 [89 S.Ct. 2056, 2063, 23 L.Ed.2d 707], the Supreme Court held that the double jeopardy prohibition was " 'fundamental to the American scheme of justice' " and therefore enforceable against the states as an element of the due process protection embodied in the Fourteenth Amendment. Nevertheless, the Supreme Court has never held that the double jeopardy clause applies generally to proceedings, like the one in this case, to determine whether a defendant should receive a longer sentence because of prior convictions. We have on a few occasions noted and expressly declined to decide this question. (*People* v. *Valladoli* (1996) 13 Cal.4th 590, 608 [54 Cal.Rptr.2d 695, 918 P.2d 999]; *People* v. *Wiley* (1995) 9 Cal.4th 580, 593, fn. 8 [38 Cal.Rptr.2d 347, 889 P.2d 541]; *People* v. *Saunders* (1993) 5 Cal.4th 580, 593 [20 Cal.Rptr.2d 638, 853 P.2d 1093].)

██ At the outset we emphasize that, in the absence of a statutory provision, a criminal defendant is not entitled as a federal constitutional matter to a trial, formal or informal, of sentencing issues, even when the sentence turns on factual determinations such as the existence of prior convictions. In *Williams* v. *New York* (1949) 337 U.S. 241 [69 S.Ct. 1079, 93 L.Ed. 1337] (*Williams*), a jury convicted the defendant of first degree murder and recommended life imprisonment. (*Id.* at pp. 242-243 [69 S.Ct. at pp. 1080-1081].) The judge, however, sentenced the defendant to death after considering the evidence "in the light of additional information obtained through the court's 'Probation Department, and through other sources.' " (*Id.* at p. 242 [69 S.Ct. at p. 1081].) Among other things, the judge noted that the defendant had been involved in " 'thirty . . . burglaries in and about the same vicinity.' " (*Id.* at p. 244 [69 S.Ct. at p. 1081].) No court had ever convicted the defendant of these 30 burglaries, but "the judge had information that [the defendant] had confessed to some and had been identified as the perpetrator of some of the others." (*Ibid.*) The judge's rather informal factfinding procedure was consistent with applicable New York law, which permitted the sentencing court to " 'seek any information that will aid the court' " (*id.* at p. 243 [69 S.Ct. at p. 1081]), including information "obtained outside the courtroom from persons whom a defendant has not been permitted to confront or cross-examine" (*id.* at p. 245 [69 S.Ct. at p. 1082]).

The United States Supreme Court upheld the sentence. The high court noted that the procedural protections applicable in a trial on guilt (notice of the charges, opportunity to cross-examine adverse witnesses, opportunity to

offer evidence, and representation by counsel) traditionally have not applied at sentencing. (*Williams, supra*, 337 U.S. at pp. 245-246 [69 S.Ct. at pp. 1082-1083].) Historically, the court pointed out, sentencing judges could even rely on their personal knowledge of a defendant. (*Id.* at p. 246 [69 S.Ct. at pp. 1082-1083].) The court concluded, "The due process clause should not be treated as a device for freezing the evidential procedure of sentencing in the mold of trial procedure." (*Id.* at p. 251 [69 S.Ct. at p. 1085].)

The high court has broadly described *Williams* as holding "that the Due Process Clause of the Fourteenth Amendment [does] not require a judge to have hearings and to give a convicted person an opportunity to participate in those hearings when he [comes] to determine the sentence to be imposed." (*Specht* v. *Patterson* (1967) 386 U.S. 605, 606 [87 S.Ct. 1209, 1210, 18 L.Ed.2d 326]. Moreover, though the high court has retreated from *Williams* in capital cases (*Gardner* v. *Florida* (1977) 430 U.S. 349 [97 S.Ct. 1197, 51 L.Ed.2d 393]), it has otherwise reaffirmed *Williams* as recently as last term. (*U.S.* v. *Watts* (1997) 519 U.S. 148, __ [117 S.Ct. 633, 635, 136 L.Ed.2d 554]; see also *Witte* v. *U.S.* (1995) 515 U.S. 389, 398 [115 S.Ct. 2199, 2205, 132 L.Ed.2d 351] ["[T]he Due Process Clause [does] not require 'that courts throughout the Nation abandon their age-old practice of seeking information from out-of-court sources to guide their judgment toward a more enlightened and just sentence.' "].)

Because, in a noncapital case, a state need not provide a trial of sentencing allegations *at all*, a state that elects to provide a trial of these allegations can circumscribe the procedural boundaries of that trial. So long as the state affords minimal due process of law, it need not provide all the procedural guaranties that characterize a trial on guilt or innocence. Thus, a state that provides a trial of sentencing allegations need not provide a jury trial. (*People* v. *Vera* (1997) 15 Cal.4th 269, 274, 277 [62 Cal.Rptr.2d 754, 934 P.2d 1279]; *People* v. *Wims* (1995) 10 Cal.4th 293, 304-306 [41 Cal.Rptr.2d 241, 895 P.2d 77]; *People* v. *Wiley, supra,* 9 Cal.4th at pp. 584-585, 589.) For the same reason, a state that provides a trial of sentencing allegations arguably need not provide double jeopardy protection.

Though states need not provide a trial of sentencing allegations, the California Legislature has elected to grant defendants a statutory right to a jury trial of prior conviction allegations. Section 1025 provides: "[T]he question whether or not [a defendant] has suffered [a] previous conviction must be tried by the jury which tries the issue upon the plea of not guilty, or in case of a plea of guilty, by a jury impaneled for that purpose . . . ." A survey of our decisions indicates that we have expanded section 1025's bare grant of a jury trial to include various procedural guaranties. For example,

we have stated in dictum that the prosecution must prove a prior conviction allegation beyond a reasonable doubt (*People* v. *Tenner* (1993) 6 Cal.4th 559, 566 [24 Cal.Rptr.2d 840, 862 P.2d 840] (*Tenner*); *In re Yurko* (1974) 10 Cal.3d 857, 862 [112 Cal.Rptr. 513, 519 P.2d 561]) and that the accused enjoys the privilege against self-incrimination (*In re Yurko*, *supra*, 10 Cal.3d at p. 863, fn. 5). Similarly, we have held that the rules of evidence apply in these trials. (*People* v. *Reed* (1996) 13 Cal.4th 217, 224 [52 Cal.Rptr.2d 106, 914 P.2d 184]; *People* v. *Myers* (1993) 5 Cal.4th 1193, 1201 [22 Cal.Rptr.2d 911, 858 P.2d 301].) Finally, we have stated that a defendant in a trial of a prior conviction allegation has a right to " 'be confronted with witnesses against him [and] to cross-examine' " those witnesses. (*People* v. *Reed*, *supra*, 13 Cal.4th at p. 228, fn. 6, quoting *Specht* v. *Patterson*, *supra*, 386 U.S. at p. 610 [87 S.Ct. at pp. 1212-1213]; *In re Yurko*, *supra*, 10 Cal.3d at p. 863, fn. 5.) Arguably, the next step in the logical progression of these decisions is for us now to hold that the constitutional protections against double jeopardy apply. Constitutional law, however, does not grow inevitably by accretion; rather, each question rises or falls on its individual merits.

With this point in mind, we turn to an analysis of the double jeopardy clause of the federal Constitution. The double jeopardy clause by its terms proscribes a second jeopardy "for the same *offense*." (U.S. Const., 5th Amend., italics added.) The clause makes no express reference to sentencing determinations. Our review of the Supreme Court's decisions indicates that court is reluctant to apply the clause to sentencing determinations. In *Stroud* v. *United States* (1919) 251 U.S. 15 [40 S.Ct. 50, 64 L.Ed. 103] (*Stroud*), a jury found the defendant guilty of first degree murder " 'without capital punishment,' " which was one of its options under the applicable statute. (*Id.* at pp. 17-18 [40 S.Ct. at pp. 51-52].) After the Supreme Court reversed that judgment, a jury on retrial convicted the defendant of first degree murder, but omitted the stipulation against capital punishment, and the trial court sentenced the defendant to death. (*Id.* at p. 17 [40 S.Ct. at p. 51].) The Supreme Court held that the defendant had not been "placed in second jeopardy" despite the change in his sentence from life imprisonment to death. Specifically, the court did not consider the verdict of "guilty . . . 'without capital punishment' " as a conviction of a lesser offense. "The fact that the jury may thus mitigate the punishment to imprisonment for life did not render the conviction less than one for first degree murder." (*Id.* at p. 18 [40 S.Ct. at p. 51].)

The Supreme Court reaffirmed *Stroud* in *Pearce*, *supra*, 395 U.S. at page 720 [89 S.Ct. at page 2078]. In *Pearce*, the court resolved two cases in which the defendants successfully challenged their convictions, only to receive longer overall sentences following retrials. Moreover, neither defendant

received credit for time served. (*Id.* at pp. 713-715 [89 S.Ct. at pp. 2074-2075].) The Supreme Court held that the double jeopardy clause entitled the defendants to credit for time served. (*Id.* at pp. 718-719 [89 S.Ct. at pp. 2077-2078].) Nevertheless, the double jeopardy clause did not preclude the court from imposing a longer sentence after retrial. "Long-established constitutional doctrine makes clear that [with the exception of credit for time served] the guarantee against double jeopardy imposes no restrictions upon the length of a sentence imposed upon reconviction." (*Id.* at p. 719 [89 S.Ct. at pp. 2077-2078].)

In *Chaffin* v. *Stynchcombe* (1973) 412 U.S. 17, 23-24 [93 S.Ct. 1977, 1981, 36 L.Ed.2d 714], in which the jury imposed the sentence instead of the judge, the Supreme Court, without discussion, again reaffirmed that the double jeopardy clause does not preclude a longer sentence following retrial. Finally, in *United States* v. *DiFrancesco* (1980) 449 U.S. 117 [101 S.Ct. 426, 66 L.Ed.2d 328] (*DiFrancesco*), the high court considered a statutory sentencing scheme that allowed the federal court of appeals to review the sentence that the federal district court had imposed and, at the prosecution's request, to increase that sentence " 'after considering the record' " and " 'after hearing.' " (*Id.* at p. 120, fn. 2 [101 S.Ct. at p. 429].) The high court determined that this scheme did not violate the double jeopardy clause, noting that "[h]istorically, the pronouncement of sentence has never carried the finality that attaches to an acquittal." (*Id.* at p. 133 [101 S.Ct. at p. 435].)

Thus, in a variety of contexts, the Supreme Court has declined to extend the federal guaranty against double jeopardy to sentencing proceedings. *Bullington* v. *Missouri* (1981) 451 U.S. 430 [101 S.Ct. 1852, 68 L.Ed.2d 270] (*Bullington*) marked the first departure from this consistent approach.

*Bullington* concerned imposition of the death penalty under Missouri law. In accord with the Supreme Court's decisions in *Furman* v. *Georgia* (1972) 408 U.S. 238 [92 S.Ct. 2726, 33 L.Ed.2d 346], *Gregg* v. *Georgia* (1976) 428 U.S. 153 [96 S.Ct. 2909, 49 L.Ed.2d 859], and the capital cases decided on the same day as *Gregg*, Missouri's death penalty statute included intricate procedural safeguards. For example, the trial court had to conduct a separate presentence hearing for a defendant convicted of capital murder. The hearing had to be held before the same jury that found the defendant guilty. At the hearing, the jury considered additional evidence and determined whether any aggravating or mitigating circumstances existed, whether the aggravating circumstances warranted the death penalty, and whether the mitigating circumstances outweighed the aggravating circumstances. The jury had to make its findings beyond a reasonable doubt. Finally, the court had to instruct the jury that it need not impose the death penalty even if it found

sufficient aggravating circumstances that mitigating circumstances did not outweigh. (*Bullington, supra,* 451 U.S. at pp. 433-435 [101 S.Ct. at pp. 1855-1856].)

A Missouri jury convicted Robert Bullington of capital murder. As required, the court held a presentence hearing, and the jury returned a verdict of "imprisonment for life without eligibility for probation or parole for 50 years." (*Bullington, supra,* 451 U.S. at p. 436 [101 S.Ct. at p. 1856].) The trial court then granted Bullington's motion for a new trial, finding error in jury selection. Despite the Supreme Court's decision in *Stroud, supra,* 251 U.S. 15, the court also ruled, on double jeopardy grounds, that the prosecution could not seek the death penalty on retrial. (*Bullington, supra,* 451 U.S. at p. 436 [101 S.Ct. at pp. 1856-1857].) The prosecution petitioned for a writ of prohibition or mandamus, and the state supreme court granted the writ, holding that double jeopardy principles did not bar the prosecution from seeking the death penalty. (*Id.* at pp. 436-437 [101 S.Ct. at pp. 1856-1857].) The United States Supreme Court reversed, holding that the double jeopardy clause did bar imposition of the death penalty. (*Id.* at pp. 446-447 [101 S.Ct. at pp. 1862-1863].) Noting that, under the applicable Missouri death penalty law, the jury determined the sentence at "a separate hearing" and did not have "unbounded discretion," but rather chose "between two alternatives," and that "the prosecution . . . undertook the burden of establishing certain facts beyond a reasonable doubt" (*id.* at p. 438 [101 S.Ct. at p. 1858]), the high court reasoned that the penalty phase of a Missouri capital trial had "the hallmarks of the trial on guilt or innocence" (*id.* at p. 439 [101 S.Ct. at p. 1858]) and therefore that the double jeopardy prohibition applied (*id.* at pp. 438, 446 [101 S.Ct. at pp. 1857-1858, 1862]). The court reaffirmed *Bullington* in *Arizona* v. *Rumsey* (1984) 467 U.S. 203, 212 [104 S.Ct. 2305, 2310-2311, 81 L.Ed.2d 164], a case in which the judge, not the jury, determined the appropriate sentence.

■ On its face, a section 1025 trial at which a California jury determines the truth of a prior conviction allegation also has "the hallmarks of the trial on guilt or innocence." Thus, the defendant has a right to counsel, notice, and an opportunity to be heard. (*Oyler* v. *Boles* (1962) 368 U.S. 448, 452 [82 S.Ct. 501, 503-504, 7 L.Ed.2d 446].) The prosecution must "plead and prove" the prior conviction allegation (§§ 667, subds. (c) and (g), 1170.12, subds. (a) and (e)) at a "trial" (§ 1025). The prosecution has the burden of proof beyond a reasonable doubt. (*Tenner, supra,* 6 Cal.4th at p. 566.) Finally, the trier of fact faces a choice between two alternatives. (§ 1158.) Nevertheless, for reasons we discuss below, we believe *Bullington*'s "hallmarks of the trial" analysis does not apply here.

Significantly, the high court in subsequent cases has suggested that *Bullington* does not apply to noncapital cases. For example, in *Pennsylvania* v.

*Goldhammer* (1985) 474 U.S. 28 [106 S.Ct. 353, 88 L.Ed.2d 183], the court reaffirmed that its decisions " 'clearly establish that a sentenc[ing *in a noncapital case*] does not have the qualities of constitutional finality that attend an acquittal.' " (*Id.* at p. 30 [106 S.Ct. at pp. 353-354], bracketed language in *Goldhammer*, italics added.) Similarly, in *Caspari* v. *Bohlen*, the court noted that *Bullington* "was based largely on the unique circumstances of a capital sentencing proceeding." (*Caspari* v. *Bohlen* (1994) 510 U.S. 383, 392 [114 S.Ct. 948, 954, 127 L.Ed.2d 236] (*Caspari*).) The court added: "*Goldhammer* and *Strickland* [v. *Washington* (1984) 466 U.S. 668 (104 S.Ct. 2052, 80 L.Ed.2d 674)] strongly suggested that *Bullington* was limited to capital sentencing." (*Caspari, supra,* 510 U.S. at p. 393 [114 S.Ct. at p. 955].)

Moreover, many of the procedural protections that apply in a section 1025 trial rest on statutory, not federal constitutional, grounds. On the other hand, many of the elaborate procedures at the penalty phase of a capital trial originate directly in the Supreme Court's decisions interpreting the federal Constitution. This distinction is relevant to our analysis because, when a state legislature has elected *at its option* to provide a trial-like proceeding to resolve a factual issue that a judge could otherwise resolve with no hearing at all, common sense suggests that the legislature need not provide all the procedural protections that apply in a constitutionally mandated trial.

Furthermore, despite some common procedural protections, the sentencing proceeding here and that in *Bullington* are more unlike than alike. First, the trial-like procedures that regulate imposition of the death penalty find no parallel in noncapital cases. Unlike the death penalty sentencing procedure at issue in *Bullington*, a trial of prior conviction allegations under section 1025 does not require the trier of fact to determine the existence of a broad range of aggravating and mitigating circumstances relating to the defendant's character. A section 1025 trial does not then require a finding that the aggravating circumstances warrant a longer sentence or a weighing of aggravating circumstances against mitigating circumstances. Nor does a section 1025 trial allow the trier of fact to reject a longer sentence even if its factual determinations support the sentence. Considering the breadth and subjectivity of the factual determinations at issue in *Bullington*, the failure of proof at issue in that case was more like an acquittal at the guilt phase of a criminal trial than is the failure of proof at issue here.

In deciding *Bullington*, the court reaffirmed the general rule that the double jeopardy clause does not apply to sentencing proceedings. (*Bullington, supra,* 451 U.S. at p. 438 [101 S.Ct. at pp. 1857-1858].) The court then carved out a narrow exception to this general rule. (*Ibid.*) The court did not

overrule *Stroud, supra*, 251 U.S. 15, which also involved imposition of the death penalty. Rather, it distinguished *Stroud* on the basis of the procedural safeguards that arise from modern death penalty jurisprudence. (*Bullington, supra*, 451 U.S. at p. 446 [101 S.Ct. at p. 1862].) Most of those procedural safeguards are unique to death penalty determinations and simply do not apply here.

Second, the financial and emotional burden of the sentencing proceeding at issue in *Bullington* distinguishes *Bullington* from this case. The court in *Bullington* stressed that "[t]he 'embarrassment, expense and ordeal' and the 'anxiety and insecurity' faced by a defendant at the penalty phase of a Missouri capital murder trial surely are at least equivalent to that faced by any defendant at the guilt phase of a criminal trial." (*Bullington, supra*, 451 U.S. at p. 445 [101 S.Ct. at p. 1861].) By comparison, though a trial of prior conviction allegations is undoubtedly *important* to a defendant—possibly increasing a short prison term to a life term—the level of embarrassment, expense, and anxiety involved is not "equivalent to that faced . . . at the guilt phase" of the trial. (*Ibid.*) This lesser financial and emotional burden exists even when the prior conviction trial may substantially increase the length of the sentence.

The trial is not a prosecution of an additional criminal offense carrying the stigma associated with a criminal charge; rather it is merely a determination, for purposes of punishment, of the defendant's *status*, which, like age or gender, is readily determinable from the public record. Moreover, when, as here, the court has bifurcated the prior conviction issue, the defendant begins the prior conviction trial having already suffered the embarrassment of the present conviction. The marginal increase in embarrassment attributable to the prior conviction trial is not comparable to the embarrassment of an unproved criminal charge. Finally, a prior conviction trial is simple and straightforward as compared to the guilt phase of a criminal trial. Often it involves only the presentation of a certified copy of the prior conviction along with the defendant's photograph and fingerprints. In many cases, defendants offer no evidence at all, and the outcome is relatively predictable. In this case, for example, the prior conviction trial, which looked more like an informal hearing than a trial, fills only a few pages of a 244-page reporter's transcript. This abbreviated proceeding, at which the prosecution presented only documentary evidence and defendant presented no evidence, is hardly comparable to the penalty phase of a capital trial, which was the trial-like proceeding at issue in *Bullington*.

Even when, as here, the prior conviction trial involves some factual point relating to the prior crime, such as whether the defendant acted personally,

the proceeding is not like "the trial on guilt" (*Bullington, supra*, 451 U.S. at p. 439 [101 S.Ct. at p. 1858]) because the prosecution may only present evidence from the *record* of the prior conviction (*People* v. *Guerrero* (1988) 44 Cal.3d 343, 355 [243 Cal.Rptr. 688, 748 P.2d 1150] (*Guerrero*)). The defendant, and any member of the public, can review that record before the prior conviction trial and accurately forecast the trial's outcome. When a trial, even a very important trial, is short and readily predictable in this way, the defendant suffers correspondingly less embarrassment, expense, and anxiety. Significantly, the defendant does not need to sit for weeks or months while witnesses describe in detail to a jury and the public the specifics of his alleged unlawful activities. For these reasons, we conclude the financial and emotional burden of a prior conviction trial is minor as compared to a guilt trial. (Cf. *DiFrancesco, supra*, 449 U.S. at p. 136 [101 S.Ct. at p. 437] ["The defendant's primary concern and anxiety obviously relate to the determination of innocence or guilt, and that already is behind him."].)

Third, the nature of the issues involved at the penalty phase of a capital trial distinguishes *Bullington* from this case. The sentence determination in a capital case necessarily depends on the specific facts of the defendant's present crime, as well as an overall assessment of the defendant's character. The evidence usually overlaps or supplements the evidence offered at the guilt phase of the trial. On the other hand, in a trial of a prior conviction allegation, the factual determinations are generally divorced from the facts of the present offense, and the evidence does not overlap at all. Like a trial in which the defendant's age or gender is at issue, the prior conviction trial merely determines a question of the defendant's continuing status, irrespective of the present offense, and the prosecution may reallege and retry that status in as many successive cases as it is relevant (*People* v. *Biggs* (1937) 9 Cal.2d 508, 512 [71 P.2d 214, 116 A.L.R. 205]; *People* v. *Dutton* (1937) 9 Cal.2d 505, 507 [71 P.2d 218]), even if a prior jury has rejected the allegation (*People* v. *Rice* (1988) 200 Cal.App.3d 647, 654-656 [246 Cal.Rptr. 177]). If a jury rejects the allegation, it has not acquitted the defendant of his prior conviction status. (*Ibid.*) "A defendant cannot be 'acquitted' of that status any more than he can be 'acquitted' of being a certain age or sex or any other inherent fact." (*Durham* v. *State* (Ind. 1984) 464 N.E.2d 321, 324.)

Given these distinctions, we do not believe *Bullington* requires application of the double jeopardy clause to all sentencing proceedings that have "the hallmarks of the trial on guilt or innocence." (*Bullington, supra*, 451 U.S. at p. 439 [101 S.Ct. at p. 1858].) Nevertheless, other state courts and the federal circuit courts are divided as to whether the federal double jeopardy

clause applies to proceedings analogous to the one here. Some courts conclude that, where the prior conviction determination involves a trial-like proceeding at which the prosecution has the burden of proving certain disputed facts, a negative finding is tantamount to an acquittal of the facts necessary to establish a longer sentence, and double jeopardy protections bar retrial. (See, e.g., *Bohlen* v. *Caspari* (8th Cir. 1992) 979 F.2d 109, 113, revd. on other grounds in *Caspari, supra,* 510 U.S. at pp. 396-397 [114 S.Ct. at pp. 956-957]; *Durosko* v. *Lewis* (9th Cir. 1989) 882 F.2d 357, 359; *Briggs* v. *Procunier* (5th Cir. 1985) 764 F.2d 368, 371; *People* v. *Quintana* (Colo. 1981) 634 P.2d 413, 419; *Cooper* v. *State* (Tex.Crim.App. 1982) 631 S.W.2d 508, 513-514; *State* v. *Hennings* (1983) 100 Wn.2d 379, 386-390 [670 P.2d 256, 259-262].) These courts, however, do not fully appreciate the unique nature and constitutional origins of capital sentencing proceedings as compared to prior conviction proceedings. Accordingly, we find more persuasive those decisions involving noncapital sentencing proceedings in which courts found the federal double jeopardy clause did not apply. (See, e.g., *Carpenter* v. *Chapleau* (6th Cir. 1996) 72 F.3d 1269, 1274 ["We do not believe the Double Jeopardy Clause is implicated in [a persistent felony offender] proceeding."]; *Denton* v. *Duckworth* (7th Cir. 1989) 873 F.2d 144, 148 ["We agree . . . that the habitual offender statute, which does not create a separate offense or require consideration of the underlying facts on the substantive charge, is distinguishable from the statute at issue in *Bullington,* and thus double jeopardy does not attach."]; *Linam* v. *Griffin* (10th Cir. 1982) 685 F.2d 369, 376 [The habitual criminal proceeding "is an inquiry as to whether or not the man standing before the court is the same person who was previously convicted as charged. The jury answers yes or no in accordance with the evidence. This is not the kind of adjudication that is referred to in the fifth amendment."]; *Durham* v. *State, supra,* 464 N.E.2d at p. 324 ["The habitual offender status . . . is a continuing status of a particular defendant . . . . The state may use this status any time the defendant commits a further crime and a jury's determination that a defendant is not a habitual offender during a particular trial is not an 'acquittal' of that defendant's status as a habitual offender."]; *State* v. *Cobb* (Mo. 1994) 875 S.W.2d 533, 536 ["The constitutional double jeopardy prohibition does not speak to sentencing except in capital cases."]; *State* v. *Aragon* (1993) 116 N.M. 267, 271 [861 P.2d 948, 952] ["Because our habitual criminal proceedings are not 'prosecutions' of an 'offense' and sentencing does not imply guilt or innocence of any greater crime, . . . double jeopardy does not attach."]; cf. *Wilmer* v. *Johnson* (3d Cir. 1994) 30 F.3d 451, 456 ["[I]n *Bullington,* a capital case, the Court carved out an exception to the general rule that the Double Jeopardy Clause does not apply in the sentencing context."]; *U.S.* v. *Rodriguez-Gonzalez* (2d Cir. 1990) 899 F.2d 177, 181 ["Reliance on . . . *Bullington* is inapposite . . . since [that] case[] arose in the unique context of

capital sentencing."]; *People* v. *Levin* (1993) 157 Ill.2d 138 [191 Ill.Dec. 72, 623 N.E.2d 317, 325] ["We conclude that the separate hearing procedure under our [Habitual Criminal] Act bears insufficient formalities of a trial to render that factor analogous to the separate hearing procedure in *Bullington* and to this defendant's trial on the issue of guilt."]; *People* v. *Sailor* (1985) 65 N.Y.2d 224, 231-236 [491 N.Y.S.2d 112, 480 N.E.2d 701, 708] ["[T]here is a qualitative and quantitative difference between imposition of the death penalty [at issue in *Bullington*] and sentencing as a persistent or second felony offender . . . ."]; but see *Perkins* v. *State* (Ind. 1989) 542 N.E.2d 549, 551-552 [overruling *Durham* v. *State, supra,* 464 N.E.2d 321, but relying on a clear misreading of *Lockhart* v. *Nelson* (1988) 488 U.S. 33, 37-38, fn. 6 [109 S.Ct. 285, 289, 102 L.Ed.2d 265].)

Our conclusion finds some support in the high court's most recent discussion of the issue in *Caspari, supra,* 510 U.S. 383. In *Caspari,* as in this case, the state court of appeals reversed a sentence because the record contained insufficient evidence that the defendant was a "persistent offender." (*Id.* at pp. 386-387 [114 S.Ct. at pp. 951-952].) On remand, the prosecution offered additional evidence, and the trial court imposed the same sentence. The state court of appeals affirmed the sentence, concluding that the federal double jeopardy clause does not apply to sentencing proceedings and therefore did not bar retrial of the persistent offender issue. (*State* v. *Bohlen* (Mo.Ct.App. 1985) 698 S.W.2d 577, 578.) The defendant subsequently petitioned the federal district court for a writ of habeas corpus. The district court denied the writ, but the federal court of appeals reversed, holding that the double jeopardy clause does apply to noncapital sentencing proceedings. The Supreme Court granted certiorari. (*Caspari, supra,* 510 U.S. at pp. 387-388 [114 S.Ct. at pp. 951-952].)

In deciding *Caspari,* the Supreme Court applied *Teague* v. *Lane* (1989) 489 U.S. 288 [109 S.Ct. 1060, 103 L.Ed.2d 334] (*Teague*), which held that new rules of constitutional law do not generally apply retroactively so as to permit reopening of final convictions by way of habeas corpus petitions. The *Caspari* court reasoned that, if application of the federal double jeopardy clause to noncapital sentencing proceedings would constitute a "new constitutional rule of criminal procedure" that would "break[] new ground or impose[] a new obligation on the States" (*Teague, supra,* 489 U.S. at pp. 299, 301 [109 S.Ct. at pp. 1069, 1070] (plur. opn. of O'Connor, J.)), then the district court correctly denied the writ of habeas corpus. (*Caspari, supra,* 510 U.S. at p. 390 [114 S.Ct. at p. 953].) The court noted its historic refusal to apply the double jeopardy clause to sentencing proceedings, with the only exception being capital sentencing proceedings such as the one at issue in *Bullington.* (*Caspari, supra,* 510 U.S. at pp. 391-392 [114 S.Ct. at pp.

954-955].) The court then compared sentencing proceedings in noncapital cases to those in capital cases. Noting that sentencing in a capital case is unique and that procedural safeguards apply in capital cases that do not apply in other cases (*id.* at pp. 392-393 [114 S.Ct. at pp. 954-955]), the court concluded "that the [federal] Court of Appeals announced a new rule in this case" by extending *Bullington* to noncapital cases (*Caspari, supra*, 510 U.S. at p. 395 [114 S.Ct. at p. 956]). Accordingly, the defendant's sentence was " 'consistent with established constitutional standards' " as of the time the sentence became final (*Teague, supra*, 489 U.S. at p. 306 [109 S.Ct. at p. 1073] (plur. opn. of O'Connor, J.), quoting *Desist* v. *United States* (1969) 394 U.S. 244, 262-263 [89 S.Ct. 1030, 1040-1041, 22 L.Ed.2d 248] (dis. opn. of Harlan, J.)), and the federal court of appeals erred in directing the district court to grant the writ (*Caspari, supra*, 510 U.S. at pp. 396-397 [114 S.Ct. at pp. 956-957]).

Given this conclusion, the high court declined to decide whether the double jeopardy clause apply to noncapital sentencing proceedings. (*Caspari, supra*, 510 U.S. at p. 397 [114 S.Ct. at p. 957].) Nevertheless, the court confirmed that none of its decisions apply the clause in that context. Indeed, the court asserted that "a reasonable jurist reviewing our precedents" would not conclude otherwise. (*Id.* at p. 393 [114 S.Ct. at p. 955].) Thus, though we do not know how the Supreme Court would resolve the issue now before us, we do know that, like the sentence imposed in *Caspari*, the sentence here is " 'consistent with established constitutional standards.' " (*Teague, supra*, 489 U.S. at p. 306 [109 S.Ct. at p. 1073] (plur. opn. of O'Connor, J.).) Furthermore, *Caspari* highlights the basic flaw of the dissent's reasoning. The premise of the dissent is that *Bullington* requires application of the federal double jeopardy clause whenever a sentencing proceeding, whether capital or noncapital, has "the hallmarks of the trial on guilt or innocence." (*Bullington, supra*, 451 U.S. at p. 439 [101 S.Ct. at p. 1858].) The Missouri persistent offender statutes at issue in *Bohlen* v. *Caspari*, like section 1025, created a proceeding with all these "hallmarks," including proof beyond a reasonable doubt. (*Bohlen* v. *Caspari, supra*, 979 F.2d at pp. 112-113.) If the dissent's articulation of *Bullington*'s holding were correct, then the court of appeals' decision in *Caspari*, barring retrial of the persistent offender issue, would have constituted a straight application of established precedent. The high court would not have found that retrial was " 'consistent with established constitutional standards' " (*Teague, supra*, 489 U.S. at p. 306 [109 S.Ct. at p. 1073] (plur. opn. of O'Connor, J.)), and the high court would not have concluded "that the Court of Appeals announced a new rule in this case." (*Caspari, supra*, 510 U.S. at p. 395 [114 S.Ct. at p. 956].) In light of *Caspari*, *Bullington* simply does not dictate the result in this case.

Finally, the *Caspari* court suggested that, if faced with the issue, it would find the double jeopardy clause inapplicable to the sentencing determination involved here. "Persistent-offender status is a fact objectively ascertainable on the basis of readily available evidence. Either a defendant has the requisite number of prior convictions, or he does not. Subjecting him to a second proceeding at which the State has the opportunity to show those convictions is not unfair and will enhance the accuracy of the proceeding by ensuring that the determination is made on the basis of competent evidence." (*Caspari, supra,* 510 U.S. at p. 396 [114 S.Ct. at pp. 956-957].)

In conclusion, we hold that the federal double jeopardy clause does not apply to the trial of the prior conviction allegation in this case.

Of course, in *People v. Superior Court (Marks)* (1991) 1 Cal.4th 56, 78, footnote 22 [2 Cal.Rptr.2d 389, 820 P.2d 613], we applied double jeopardy protections to bar retrial of a sentence-enhancing allegation in a noncapital case, saying: "The jury's rejection [of the allegation] constituted an express acquittal on the enhancement and forecloses any retrial." In *Marks,* we relied primarily on the Court of Appeal decision in *People v. Pettaway* (1988) 206 Cal.App.3d 1312, 1331-1332 [254 Cal.Rptr. 436], which in turn relied on *People v. Henderson* (1963) 60 Cal.2d 482 [35 Cal.Rptr. 77, 386 P.2d 677] and *People v. Collins* (1978) 21 Cal.3d 208 [145 Cal.Rptr. 686, 577 P.2d 1026]. *Henderson,* which we reaffirmed in *Collins,* held that, when a defendant successfully challenges his conviction, the state double jeopardy clause prohibits imposition of a greater sentence following retrial, thus preventing an "unreasonabl[e] impair[ment]" of "[a] defendant's right of appeal from an erroneous judgment." (*People v. Henderson, supra,* 60 Cal.2d at p. 497; see also *People v. Collins, supra,* 21 Cal.3d at p. 216; *People v. Hood* (1969) 1 Cal.3d 444, 459 [82 Cal.Rptr. 618, 462 P.2d 370]; *People v. Ali* (1967) 66 Cal.2d 277, 281 [57 Cal.Rptr. 348, 424 P.2d 932].) Our reference in *Marks* to "an express acquittal on the enhancement" might suggest a broader holding than mere application of *Henderson* and its progeny, but because *Marks* included no analysis of the complex issues we address in this case, we think a narrow reading of *Marks* is appropriate. (See *People v. Santamaria* (1994) 8 Cal.4th 903, 914, fn. 4 [35 Cal.Rptr.2d 624, 884 P.2d 81] [stating the policy underlying *Henderson* as a reason for barring retrial of enhancements].)[2] Because we based our decision in *Marks* on an interpretation of the California Constitution that is not relevant here, *Marks* has no bearing upon our interpretation of the federal Constitution.

*California Constitution*

We must also determine whether the double jeopardy protection of the California Constitution bars retrial of the prior conviction allegation in this

---

[2]Whether *Marks* correctly applied the *Henderson* rule is not before us.

case. The state Constitution provides that "[p]ersons may not twice be put in jeopardy for the same offense." (Cal. Const., art. I, § 15.) By comparison, the federal Constitution provides that "[n]o person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb." (U.S. Const., 5th Amend.) ▮ The "California Constitution is a document of independent force and effect that may be interpreted in a manner more protective of defendants' rights than that extended by the federal Constitution . . . ." (*People* v. *Fields* (1996) 13 Cal.4th 289, 298 [52 Cal.Rptr.2d 282, 914 P.2d 832].) Nevertheless, when we interpret a provision of the California Constitution that is similar to a provision of the federal Constitution, " 'cogent reasons must exist' " before we will construe the Constitutions differently and " 'depart from the construction placed by the Supreme Court of the United States.' " (*Raven* v. *Deukmejian* (1990) 52 Cal.3d 336, 353 [276 Cal.Rptr. 326, 801 P.2d 1077], quoting *Gabrielli* v. *Knickerbocker* (1938) 12 Cal.2d 85, 89 [82 P.2d 391].)

▮ The purpose behind the state and federal double jeopardy provisions is the same. Like decisions interpreting the federal double jeopardy clause, "[d]ecisions under the double jeopardy clause of the California Constitution . . . recognize the defendant's interest in avoiding both the stress of repeated prosecutions and the enhanced risk of erroneous conviction." (*People* v. *Fields*, *supra*, 13 Cal.4th at p. 298.) In certain contexts, this court has decided that, in furthering this purpose, the state double jeopardy clause provides greater protection than its federal counterpart. The rule, which we already discussed, protecting defendants from receiving a greater sentence if reconvicted after a successful appeal (see *People* v. *Collins*, *supra*, 21 Cal.3d at p. 216; *People* v. *Hood*, *supra*, 1 Cal.3d at p. 459; *People* v. *Ali*, *supra*, 66 Cal.2d at p. 281; *People* v. *Henderson*, *supra*, 60 Cal.2d at pp. 495-497) is one instance where we have interpreted the state double jeopardy clause more broadly than the federal clause. (Cf. *Pearce*, *supra*, 395 U.S. at pp. 719-721 [89 S.Ct. at pp. 2077-2079] [finding no violation of the federal double jeopardy clause under similar circumstances].) A second instance is the rule prohibiting retrial after the trial court has declared a mistrial without the defendant's consent. (*Curry* v. *Superior Court* (1970) 2 Cal.3d 707, 715-718 [87 Cal.Rptr. 361, 470 P.2d 345]; *Cardenas* v. *Superior Court* (1961) 56 Cal.2d 273, 275-276 [14 Cal.Rptr. 657, 363 P.2d 889]; cf. *Gori* v. *United States* (1961) 367 U.S. 364, 365 [81 S.Ct. 1523, 1524, 6 L.Ed.2d 901] [finding no violation of the federal double jeopardy clause under similar circumstances].)

Under the circumstances of the present case, we find no reason to construe the California Constitution to afford greater protection than the federal Constitution. As we described above, though the effect on a defendant's

sentence may be significant, the embarrassment, expense, and anxiety of trying a prior conviction allegation are relatively minor, and the risk of an erroneous result is slight. The primary source of embarrassment is the defendant's present offense, not an allegation of a prior conviction. The trial of a prior conviction allegation is relatively perfunctory, and the outcome is usually predictable. We see no reason, in the present context, to interpret the state Constitution differently from the federal. (Cf. *People* v. *Saunders, supra,* 5 Cal.4th at p. 596.) ▮ Accordingly, we conclude that the double jeopardy provision of the state Constitution does not apply to the trial of the prior conviction allegation in this case. (Cf. *People* v. *Morton* (1953) 41 Cal.2d 536 [261 P.2d 523] [permitting retrial of a prior conviction allegation under facts similar to those here, but without discussing double jeopardy].)

## CONCLUSION

We conclude that the state and federal double jeopardy protections do not apply to the trial of the prior conviction allegation in this case. Of course, this conclusion raises numerous secondary issues. For example, the Court of Appeal's determination that the evidence was insufficient to prove defendant's prior conviction was of a serious felony is, at the very least, the law of this case. Thus, the prosecution would have to present additional evidence at a retrial of the prior conviction allegation in order to obtain a different result. What limitations might apply to this additional evidence (other than the limitations we identified in *People* v. *Reed, supra,* 13 Cal.4th 217, and *Guerrero, supra,* 44 Cal.3d 343) we do not decide, because the Court of Appeal did not address that issue. For the same reason, we express no opinion about whether section 1025 (or some other applicable provision) might in some cases bar retrial of the prior conviction allegation as a statutory matter irrespective of constitutional constraints. Finally, we express no opinion about whether due process protections preclude the prosecution from retrying the prior conviction allegation. (Cf. *Pearce, supra,* 395 U.S. at pp. 723-724 [89 S.Ct. at pp. 2079-2080]; *Blackledge* v. *Perry* (1974) 417 U.S. 21, 28-29 [94 S.Ct. 2098, 2102-2103, 40 L.Ed.2d 628].)

Because the state and federal double jeopardy protections do not apply to the trial of the prior conviction allegation in this case, we reverse the judgment of the Court of Appeal to the extent it barred retrial of that allegation on double jeopardy grounds.

George, C. J., and Baxter, J., concurred.

**BROWN, J., Concurring.—** ▮ I concur in the result, although I would favor a more cautious approach. The double jeopardy clause has proven

singularly difficult to apply and remains one of the most " 'misunderstood maxims in the law, the passage of time having served in the main to burden it with confusion upon confusion.' " (Westen & Drubel, *Toward a General Theory of Double Jeopardy,* 1978 Sup. Ct. Rev. 81, 82, fn. 6.)

While acknowledging that its precedents could hardly be characterized as "models of consistency and clarity" (*Burks* v. *United States* (1978) 437 U.S. 1, 9 [98 S.Ct. 2141, 2146, 57 L.Ed.2d 1]), the United States Supreme Court has held the prosecution is not entitled to retrial when a conviction is reversed for insufficient evidence. (*Id.* at pp. 9-11 [98 S.Ct. at pp. 2146-2147].) The question in this case is whether the prosecution is similarly barred from retrying a prior-conviction-sentence-enhancement allegation when the true finding is reversed for insufficient evidence.

This is a question the high court has never specifically addressed. (*Bullington* v. *Missouri* (1981) 451 U.S. 430, 445 [101 S.Ct. 1852, 1861-1862, 68 L.Ed.2d 270]; *Caspari* v. *Bohlen* (1994) 510 U.S. 383, 397 [114 S.Ct. 948, 957, 127 L.Ed.2d 236].) In *Bullington,* the court considered whether the double jeopardy clause barred the prosecution from seeking the death penalty on retrial following reversal of an earlier conviction imposing a lesser penalty. *Bullington* marked the first time the court had applied the double jeopardy clause to a sentencing determination. (*Bullington* v. *Missouri, supra,* at p. 438 [101 S.Ct. at pp. 1857-1858].)

*Bullington*'s characterization of the first jury's decision to impose life imprisonment as an acquittal of " 'whatever was necessary to impose the death sentence' " (*Bullington* v. *Missouri, supra,* 451 U.S. at p. 445 [101 S.Ct. at p. 1861], quoting *State* ex rel. *Westfall* v. *Mason* (Mo. 1980) 594 S.W.2d 908, 922 (dis. opn. of Bardgett, C. J.)), is strongly reminiscent of the court's decision in *Green* v. *United States* (1957) 355 U.S. 184 [78 S.Ct. 221, 2 L.Ed.2d 199]. In *Green,* the court held the double jeopardy clause barred retrial of a greater offense after the jury at the defendant's first trial convicted him of the lesser included offense. (*Id.* at p. 191 [78 S.Ct. at pp. 225-226].) In both settings, the failure of the prosecution to prove its greatest charge implicated a failure to prove the case-in-chief. Characterizing the failure of proof as an acquittal under these circumstances is fully consistent with the objectives of the double jeopardy clause in that it protects a defendant charged with a crime from being forced to "run the gantlet . . . on that charge" (*id.* at p. 190 [78 S.Ct. at p. 225]) more than once.

While the United States Supreme Court's cases have not "foreclosed the application of the Double Jeopardy Clause to noncapital sentencing" (*Caspari* v. *Bohlen, supra,* 510 U.S. at p. 393 [114 S.Ct. at p. 955]), none has

applied the clause in that particular context, and the question remains unresolved. In the wake of *Bullington* and *Caspari* considerable confusion exists, but a few propositions seem clear. First, the double jeopardy clause does apply to some sentencing proceedings; second, where the clause applies, its sweep is absolute and there can be no balancing of the equities; and finally, application of double jeopardy does not depend on the mechanical application of a formula. It depends instead on the nature of the determination to be made and its relationship to the underlying offense.

As the court stated in *Caspari*: "Persistent-offender status is a fact objectively ascertainable on the basis of readily available evidence. Either a defendant has the requisite number of prior convictions, or he does not. Subjecting him to a second proceeding at which the State has the opportunity to show those convictions is not unfair, and will enhance the accuracy of the proceeding by ensuring that the determination is made on the basis of competent evidence." (*Caspari* v. *Bohlen, supra*, 510 U.S. at pp. 396-397 [114 S.Ct. at pp. 956-957].)

Other jurisdictions have found the reasoning of *Bullington* inapplicable where the facts at issue in the sentencing determination have no bearing on facts relating to the present crime. (*Denton* v. *Duckworth* (7th Cir. 1989) 873 F.2d 144, 148 [unlike death penalty determination in *Bullington*, habitual offender statute does not require consideration of facts underlying substantive offense]; *Linam* v. *Griffin* (10th Cir. 1982) 685 F.2d 369, 375 [same]; *People* v. *Sailor* (1985) 65 N.Y.2d 224 [491 N.Y.S.2d 112, 480 N.E.2d 701, 707] [*Bullington* implicitly recognizes death penalty was part of substantive offense of murder].)

When the prosecutor fails to prove a prior conviction allegation, a retrial does not require a fact finder to reevaluate the evidence underlying the substantive offense. Under these circumstances a retrial does not subject a defendant to the risk of repeated prosecution within the meaning of the double jeopardy clause.

**WERDEGAR, J.**—I dissent. With due respect, I believe the majority fails to appreciate the import of the United States Supreme Court decisions touching on this difficult issue, especially the meaning of *Bullington* v. *Missouri* (1981) 451 U.S. 430 [101 S.Ct. 1852, 68 L.Ed.2d 270] (hereafter sometimes *Bullington*). As I explain, *Bullington* and its progeny compel a conclusion that the federal double jeopardy clause precludes the People from retrying the prior felony conviction allegation in this case. Moreover, even assuming the federal double jeopardy clause does not apply here, I conclude the double jeopardy clause of the state Constitution (Cal. Const., art. I, § 15)

protects Californians from multiple retrials of sentence enhancement allegations, at least as the statutory law concerning such enhancement allegations is now written.

## I. DOUBLE JEOPARDY UNDER THE FEDERAL CONSTITUTION

As the majority correctly recognizes, "the Supreme Court has never held that the double jeopardy clause applies generally to proceedings, like the one in this case, to determine whether a defendant should receive a longer sentence because of prior convictions." (Lead opn., *ante*, at p. 832; conc. opn. of Brown, J., *ante*, at p. 846 ["This is a question the high court has never specifically addressed."].) The persuasive force of this observation, however, is diminished by the fact the high court also has never held the reverse, i.e., it has never held the double jeopardy clause is *inapplicable* to all noncapital sentencing proceedings. Just as we have avoided resolving this issue (*People* v. *Valladoli* (1996) 13 Cal.4th 590, 608 [54 Cal.Rptr.2d 695, 918 P.2d 999] [assuming without deciding double jeopardy protections apply to prior conviction enhancement allegations]; *People* v. *Wiley* (1995) 9 Cal.4th 580, 593, fn. 8 [38 Cal.Rptr.2d 347, 889 P.2d 541] [need not decide the issue]), the United States Supreme Court has similarly managed to avoid a definitive decision on the issue. The most recent example of this avoidant behavior is *Caspari* v. *Bohlen* (1994) 510 U.S. 383 [114 S.Ct. 948, 127 L.Ed.2d 236] (hereafter *Caspari*), in which the high court explained that "[b]ecause of our resolution of this case on Teague[1]) grounds, we have no occasion to decide whether the Double Jeopardy Clause applies to noncapital sentencing . . . ." (*Caspari*, *supra*, 510 U.S. at p. 397 [114 S.Ct. at p. 957, 127 L.Ed.2d at p. 250]; see also *Lockhart* v. *Nelson* (1988) 488 U.S. 33, 38, fn. 6 [109 S.Ct. 285, 289, 102 L.Ed.2d 265] [because state conceded the issue, court "assume[d], without deciding," double jeopardy applied to noncapital sentencing proceedings]; *Hunt* v. *New York* (1991) 502 U.S. 964 [112 S.Ct. 432, 116 L.Ed.2d 451] (opn. of White, J. dis. from denial of cert.) [arguing high court should grant certiorari to resolve split in authority concerning the "key question . . . whether the Double Jeopardy Clause applies to trial-like sentence enhancement proceedings in noncapital cases"].) As I explain, although the slate is not entirely a clean one, the majority misapprehends the importance of *Bullington*, *supra*, 451 U.S. 430, and its progeny.

I begin with first principles. The Fifth Amendment provides: "No person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb. . . ." This provision was made applicable to the states through the

---

[1]See *Teague* v. *Lane* (1989) 489 U.S. 288 [109 S.Ct. 1060, 103 L.Ed.2d 334], governing the retroactivity of newly announced rules to cases proceeding via habeas corpus in the federal courts.

Fourteenth Amendment by the Supreme Court's decision in *Benton* v. *Maryland* (1969) 395 U.S. 784 [89 S.Ct. 2056, 23 L.Ed.2d 707]. The federal double jeopardy clause "protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." (*North Carolina* v. *Pearce* (1969) 395 U.S. 711, 717 [89 S.Ct. 2072, 2076, 23 L.Ed.2d 656], fns. omitted.) "The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." (*Green* v. *United States* (1957) 355 U.S. 184, 187-188 [78 S.Ct. 221, 223, 2 L.Ed.2d 199, 61 A.L.R.2d 1119].)

The general rule is that the federal double jeopardy prohibition does not operate to prevent a retrial following reversal of the judgment on appeal. (*North Carolina* v. *Pearce, supra*, 395 U.S. at pp. 719-720 [89 S.Ct. at pp. 2077-2078]; *United States* v. *Tateo* (1964) 377 U.S. 463, 465 [84 S.Ct. 1587, 1588-1589, 12 L.Ed.2d 448].) An important exception to this general rule, however, applies when the judgment is reversed for insufficient evidence. (*Burks* v. *United States* (1978) 437 U.S. 1 [98 S.Ct. 2141, 57 L.Ed.2d 1] (hereafter *Burks*).) In such cases, retrial is barred by the federal double jeopardy clause because "the prosecution . . . has been given one fair opportunity to offer whatever proof it could assemble. Moreover, such an appellate reversal means that the government's case was so lacking that it should not have even been submitted to the jury. Since we necessarily afford absolute finality to a jury's verdict of acquittal—no matter how erroneous its decision—it is difficult to conceive how society has any greater interest in retrying a defendant when, on review, it is decided as a matter of law that the jury could not properly have returned a verdict of guilty." (*Id.* at p. 16 [98 S.Ct. at pp. 2149-2150].) Inasmuch as *Burks* delineates the scope of federal constitutional law, we have consistently followed the rule set forth in that case. (See *People* v. *Trevino* (1985) 39 Cal.3d 667, 694-699 [217 Cal.Rptr. 652, 704 P.2d 719], disapproved on another ground, *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1216-1221 [255 Cal.Rptr. 569, 767 P.2d 1047]; *People* v. *Belton* (1979) 23 Cal.3d 516, 526-527 & fn. 13 [153 Cal.Rptr. 195, 591 P.2d 485]; see generally, 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Defenses, § 319(b), pp. 368-369 ["The *Burks* rule has been adhered to by the California courts."].)

The Court of Appeal in this case reversed the jury's finding on the alleged prior serious felony conviction, explaining the People failed to produce

sufficient evidence defendant personally inflicted great bodily injury or personally used a weapon in the prior crime. This was not a reversal for mere trial error such as the erroneous admission or exclusion of evidence at trial. Instead, the appellate court's action was a reversal for insufficient evidence. If the federal double jeopardy clause applies to sentence enhancements generally, or to the particular enhancement at issue in this case (i.e., Pen. Code, §§ 667, subds. (b)-(i) [legislative Three Strikes law], 1170.12, subds. (a)-(d) [initiative Three Strikes law]), the *Burks* rule would prohibit retrial of the enhancement allegation. The lead opinion reasons the *Burks* rule does not apply, finding the federal double jeopardy clause inapplicable to sentencing hearings unless the death penalty is involved. As I explain, the lead opinion's reading of applicable Supreme Court precedent is flawed.

The lead opinion is correct that double jeopardy protections do not apply to traditional criminal sentencing proceedings. "Historically, the pronouncement of sentence has never carried the finality that attaches to an acquittal." (*United States* v. *DiFrancesco* (1980) 449 U.S. 117, 133 [101 S.Ct. 426, 435, 66 L.Ed.2d 328] (hereafter *DiFrancesco*).) Most recently, the high court explained that "[t]raditionally, '[s]entencing courts have not only taken into consideration a defendant's prior convictions, but have also considered a defendant's past criminal behavior, even if no conviction resulted from that behavior.' *Nichols* v. *United States*, 511 U.S. 738, 747 [114 S.Ct. 1921, 1928, 128 L.Ed.2d 745, 754] (1994). We explained in *Williams* v. *New York*, 337 U.S. 241, 246 [69 S.Ct. 1079, 1082-1083, 93 L.Ed. 1337] (1949), that 'both before and since the American colonies became a nation, courts in this country and in England practiced a policy under which a sentencing judge could exercise wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law.' " (*Witte* v. *United States* (1995) 515 U.S. 389, 397-398 [115 S.Ct. 2199, 2205, 132 L.Ed.2d 351, 362-363].) "Against this background of sentencing history, we specifically have rejected the claim that double jeopardy principles bar a later prosecution or punishment for criminal activity where that activity has been considered at sentencing for a separate crime." (*Id.* at p. 398 [115 S.Ct. at p. 2205, 132 L.Ed.2d at p. 363].)

We, of course, have such "traditional" sentencing proceedings in California. Following the jury's verdict, the trial court must set a hearing within 20 judicial days of verdict for pronouncement of judgment. (Pen. Code, § 1191.) At this hearing, the trial judge considers the probation report (see Cal. Rules of Court, rules 411 [presentence investigations and reports], 411.5 [probation officer's presentence investigation report]) and exercises broad discretion in deciding whether probation is justified as a sentencing option (*id.*, rule 414 [criteria affecting probation]), in selecting the base term (*id.*,

rule 420) and in choosing whether to impose concurrent or consecutive terms (*id.*, rule 425 [criteria affecting concurrent or consecutive sentences]). In making these determinations, the trial judge considers the circumstances in aggravation (*id.*, rule 421) and in mitigation (*id.*, rule 423), which need not be either pleaded or proved by the People. (See generally, *People* v. *Hernandez* (1988) 46 Cal.3d 194, 204-206 [249 Cal.Rptr. 850, 757 P.2d 1013] [noting difference between "a trial court's decision in fashioning appropriate punishment from the need to establish before the trier of fact the wrongful criminal conduct for which punishment is being imposed"]; *People* v. *Betterton* (1979) 93 Cal.App.3d 406, 411 [155 Cal.Rptr. 537] ["full panoply of rights" not required in sentencing hearing]; *People* v. *Thomas* (1979) 87 Cal.App.3d 1014 [151 Cal.Rptr. 483] [Cal. Rules of Court intended to guide sentencing courts, not give notice of prohibited acts].) In most cases, the number of potential sentencing dispositions and permutations is great, as is the discretion of the sentencing judge. Such "traditional" sentencing proceedings are not at issue in this case, and I agree double jeopardy principles do not apply to proceedings of this type.

As is apparent, "traditional" sentencing proceedings are held without a jury, permit consideration of probation reports and involve broad sentencing court discretion to choose among a variety of outcomes. Such hearings must be distinguished from the type of criminal sentencing hearing that follows the trial on the substantive criminal offenses and is addressed typically (but not exclusively) to the existence of enhancements. In this latter type of hearing, formal notice of the sentence enhancement allegation must be given, a jury determines historical facts that can lead to enhanced or longer sentences, the People bear the burden of proof beyond a reasonable doubt by admissible evidence, and the sentencer must choose one of two outcomes. This latter type of sentencing hearing constitutes a separate trial or a "trial-like" proceeding on punishment. As I explain, the lesson of *Bullington*, *supra*, 451 U.S. 430, and its progeny is that in such cases, federal double jeopardy protections apply.

### A. *Bullington and Its Progeny*

*Bullington* involved a defendant convicted in Missouri of capital murder. Under Missouri law, the defendant in *Bullington* was entitled to a separate presentence hearing on the question of penalty. State law guaranteed him the following procedural rights at that hearing: the same jury that found him guilty of murder would hear additional evidence; notice of the aggravating evidence must be given; the jury must consider 10 aggravating and 6 mitigating factors specified by law; the jury must weigh the various factors and identify in writing which factors it found proved beyond a reasonable

doubt; the jury must find that the aggravating evidence warrants imposition of the death penalty beyond a reasonable doubt; and the jury's decision must be unanimous. (*Bullington, supra*, 451 U.S. at pp. 433-434 [101 S.Ct. at pp. 1855-1856].) After a presentence hearing, the jury eschewed the death penalty and imposed on the defendant a sentence of life with no parole for 50 years.

The defendant in *Bullington* then moved for judgment of acquittal or for a new trial. When the trial court granted the new trial motion, the prosecution announced its decision that, during the retrial, it would again seek the death penalty. The defendant objected, citing the federal double jeopardy clause, and the high court agreed. The Supreme Court first noted that it "has resisted attempts to extend [double jeopardy principles] to sentencing. The imposition of a particular sentence usually is not regarded as an 'acquittal' of any more severe sentence that could have been imposed. The Court generally has concluded, therefore, that the Double Jeopardy Clause imposes no absolute prohibition against the imposition of a harsher sentence at retrial after a defendant has succeeded in having his original conviction set aside." (*Bullington, supra*, 451 U.S. at p. 438 [101 S.Ct. at pp. 1857-1858].) For this proposition, the high court cited the cases on which the lead opinion relies, i.e., *North Carolina* v. *Pearce, supra*, 395 U.S. 711, *DiFrancesco, supra*, 449 U.S. 117, *Chaffin* v. *Stynchcombe* (1973) 412 U.S. 17 [93 S.Ct. 1977, 36 L.Ed.2d 714], *Stroud* v. *United States* (1919) 251 U.S. 15 [40 S.Ct. 50, 64 L.Ed. 103] (hereafter *Stroud*).

The *Bullington* court declined, however, to follow this line of reasoning. Because its explanation for diverging from the previous rule is critical to this case, I quote it extensively:

"The procedure that resulted in the imposition of the sentence of life imprisonment upon petitioner Bullington at his first trial, however, differs significantly from those employed in any of the Court's cases where the Double Jeopardy Clause has been held inapplicable to sentencing. The jury in this case was *not given unbounded discretion* to select an appropriate punishment from a wide range authorized by statute. Rather, *a separate hearing was required* and was held, and the jury was presented both a *choice between two alternatives and standards to guide the making of that choice.* Nor did the prosecution simply recommend what it felt to be an appropriate punishment. It undertook the *burden of establishing certain facts beyond a reasonable doubt* in its quest to obtain the harsher of the two alternative verdicts. *The presentence hearing resembled and, indeed, in all relevant respects was like the immediately preceding trial on the issue of guilt or innocence. It was itself a trial on the issue of punishment so precisely defined by the Missouri statutes.*

"In contrast, the sentencing procedures considered in the Court's previous cases *did not have the hallmarks of the trial on guilt or innocence*. In *Pearce*, *Chaffin* and *Stroud*, there was no separate sentencing proceeding at which the prosecution was required to prove—beyond a reasonable doubt or otherwise—additional facts in order to justify the particular sentence. In each of those cases, moreover, the sentencer's discretion was essentially unfettered. In *Stroud*, no standards had been enacted to guide the jury's discretion. In *Pearce*, the judge had a wide range of punishments from which to choose with no explicit standards imposed to guide him. And in *Chaffin*, the discretion given to the jury was extremely broad. That defendant, convicted in Georgia of robbery, could have been sentenced to death, to life imprisonment, or to a prison term of between 4 and 20 years. [Citation.] The statute contained no standards to guide the jury's exercise of its discretion." (*Bullington, supra*, 451 U.S. at pp. 438-440 [101 S.Ct. at pp. 1858-1859], italics added, fns. omitted.)

"In the usual sentencing proceeding, however, it is impossible to conclude that a sentence less than the statutory maximum 'constitute[s] a decision to the effect that the government has failed to prove its case.' In the normal process of sentencing, 'there are virtually no rules or tests or standards—and thus no issues to resolve . . . .' M. Frankel, Criminal Sentences: Law Without Order 38 (1973). Thus, '[t]he discretion of the judge . . . in [sentencing] matters is virtually free of substantive control or guidance. Where the judge has power to select a term of imprisonment within a range the exercise of that authority is left fairly at large.' Kadish, Legal Norm and Discretion in the Police and Sentencing Processes, 75 Harv. L. Rev. 904, 916 (1962)." (*Bullington, supra*, 451 U.S. at pp. 443-444 [101 S.Ct. at pp. 1860-1861], fn. omitted.)

"By enacting a capital sentencing procedure *that resembles a trial on the issue of guilt or innocence*, however, Missouri explicitly requires the jury to determine whether the prosecution has 'proved its case.' . . . [W]e therefore refrain from extending the rationale of *Pearce* to the very different facts of the present case. Chief Justice Bardgett, in his dissent from the ruling of the Missouri Supreme Court majority, observed that the sentence of life imprisonment which petitioner received at his first trial meant that 'the jury has already acquitted the defendant of whatever was necessary to impose the death sentence.' 594 S. W. 2d, at 922. We agree." (*Bullington, supra*, 451 U.S. at pp. 444-445 [101 S.Ct. at p. 1861], italics added and omitted.) "Having received 'one fair opportunity to offer whatever proof it could assemble,' [citation], the State is not entitled to another." (*Id.* at p. 446 [101 S.Ct. at p. 1862], quoting *Burks, supra*, 437 U.S. at p. 16 [98 S.Ct. at p. 2150].)

As is clear, the high court found *Bullington* distinguishable from prior cases because of the nature of the sentencing proceeding involved. Unlike past cases, the separate sentencing proceeding in *Bullington* bore "the hall-marks of the trial on guilt or innocence" (451 U.S. at p. 439 [101 S.Ct. at p. 1858]), including the right to a jury, notice to the defendant of the facts to be proved, the submission of evidence and presentation of argument, a sentencing choice between two alternatives, circumscribed discretion with standards to guide such discretion, and a requirement of jury unanimity and of proof beyond a reasonable doubt.

The Supreme Court followed *Bullington* three years later in *Arizona v. Rumsey* (1984) 467 U.S. 203 [104 S.Ct. 2305, 81 L.Ed.2d 164] (hereafter *Rumsey*). In *Rumsey*, the defendant was convicted of armed robbery and first degree murder. The trial judge, without a jury, found no aggravating circumstances present and thus determined the appropriate sentence under state law was life imprisonment without the possibility of parole for 25 years. On appeal, the Arizona Supreme Court found the trial judge had been mistaken in concluding no aggravating circumstance existed and remanded for a new sentencing hearing. Following the new hearing, the trial judge sentenced the defendant to the death penalty. On appeal once again, the defendant in *Rumsey* claimed imposition of the death sentence on retrial violated the federal double jeopardy clause as interpreted in *Bullington, supra,* 451 U.S. 430. The state supreme court agreed and reduced the sentence to life imprisonment.

The United States Supreme Court granted Arizona's petition for a writ of certiorari and affirmed. The high court explained that "[t]he capital sentencing proceeding in Arizona shares the characteristics of the Missouri proceeding *that make it resemble a trial* for purposes of the Double Jeopardy Clause. The sentencer—the trial judge in Arizona—is required to choose between two options: death, and life imprisonment without possibility of parole for 25 years. The sentencer must make the decision *guided by detailed statutory standards* defining aggravating and mitigating circumstances; in particular, death may not be imposed unless at least one aggravating circumstance and no mitigating circumstance is found, whereas death must be imposed if there is one aggravating circumstance and no mitigating circumstance sufficiently substantial to call for leniency. The sentencer must make findings with respect to each of the statutory aggravating and mitigating circumstances, and the sentencing hearing involves *the submission of evidence and the presentation of argument.* The *usual rules of evidence govern the admission of evidence* of aggravating circumstances, and *the State must prove the existence of aggravating circumstances beyond a reasonable doubt.* [Citations.] As the Supreme Court of Arizona held, these characteristics make the Arizona

capital sentencing proceeding indistinguishable . . . from the capital sentencing proceeding in Missouri. [Citation.]" (*Rumsey, supra,* 467 U.S. at pp. 209-210 [104 S.Ct. at p. 2309], italics added.)

The court in *Rumsey* thus underscored *Bullington*'s core holding that the federal double jeopardy clause will apply to sentencing proceedings when such proceedings bear "the hallmarks of the trial on guilt or innocence" (*Bullington, supra,* 451 U.S. at p. 439 [101 S.Ct. at p. 1858]). Stated differently, we must ask whether the sentencing proceeding involves characteristics "that make it resemble a trial for purposes of the Double Jeopardy Clause." (*Rumsey, supra,* 467 U.S. at pp. 209-210 [104 S.Ct. at p. 2309].) Despite the high court's analysis in both *Bullington* and *Rumsey*, the majority declines to follow the teaching of those cases. As I explain, the majority's approach is analytically insupportable.

B. *Attempts at Distinguishing Bullington Are Unpersuasive*

The lead opinion acknowledges the existence of *Bullington, supra,* 451 U.S. 430, and its progeny, as well as that case's " 'hallmarks of the trial on guilt or innocence' " analysis. (See lead opn., *ante,* at p. 836.) The opinion declines to apply that analysis because it finds this case is distinguishable from *Bullington* and, accordingly, "*Bullington*'s . . . analysis does not apply here." (Lead opn., *ante,* at p. 836.) First, the lead opinion contends the Supreme Court has suggested it would not apply *Bullington* to noncapital sentencing hearings. (Lead opn., *ante,* at pp. 836-837.) Second, aside from any perceived direction from the Supreme Court, the lead opinion finds it significant that "many of the procedural protections that apply in a [Penal Code] section 1025 trial rest on statutory, not federal constitutional, grounds." (Lead opn., *ante,* at p. 837.) Additionally, the lead opinion finds the procedures applicable to capital cases "find no parallel" in noncapital cases (*ibid.*); the degree of mental anguish faced by a criminal defendant subject to multiple prosecutions of enhancement provisions is insufficient to warrant double jeopardy protection (*id.* at p. 838); and capital sentencing proceedings are distinguishable because they rely on proof of facts linked to the facts of the substantive crimes (*id.,* at p. 839; see also conc. opn. of Brown, J., *ante,* at p. 847).

As I explain, any suggestions from the high court in post-*Bullington* cases are, at most, ambiguous. Nothing in *Bullington* itself suggests its analysis is limited to capital cases; more importantly, no Supreme Court case has ever *held Bullington* and its progeny are so limited. In addition, the distinction drawn by the lead opinion between statutory and constitutional protections is wholly unsupported; indeed, *Bullington* itself involved statutory procedural

protections not mandated by the federal Constitution. Finally, the lead opinion's attempt to distinguish *Bullington* and this case on their respective facts is wholly unpersuasive.

### 1. *The Supreme Court Has Never Held Bullington Is Limited to Capital Cases*

The lead opinion asserts "the high court in subsequent cases *has suggested* that *Bullington* does not apply to noncapital cases." (Lead opn., *ante*, at p. 836, italics added; but see conc. opn. of Brown, J., *ante*, at pp. 846-847 [noting "the question remains unresolved"].) Any such "suggestion," of course, would not bind this court, which has an independent constitutional obligation to adjudicate the constitutional rights of litigants before it. Moreover, the two cases the lead opinion cites as making this "suggestion," *Caspari, supra,* 510 U.S. 383, and *Pennsylvania* v. *Goldhammer* (1985) 474 U.S. 28 [106 S.Ct. 353, 88 L.Ed.2d 183] (per curiam) (hereafter *Goldhammer*), are readily distinguishable.

In *Caspari, supra,* 510 U.S. 383, the high court confronted an Eighth Circuit Court of Appeals decision applying the *Bullington* analysis, in the context of a Missouri state prisoner's habeas corpus petition, to conclude prior felony convictions under Missouri's persistent offender statutes were subject to federal double jeopardy protections; thus, a state appellate court's reversal of the finding the petitioner was a persistent offender, due to insufficient evidence of the charged priors, barred retrial of the enhancement. (*Bohlen* v. *Caspari* (8th Cir. 1992) 979 F.2d 109.) The high court did not directly address the merits of this holding; instead, the court discussed whether the Eighth Circuit's decision applying double jeopardy protection to sentencing in a noncapital case was a new rule of law requiring prospective application only. (*Teague* v. *Lane, supra,* 489 U.S. 288.) It was in this context the Supreme Court noted that "Both *Bullington* and *Rumsey* were capital cases, and our reasoning in those cases was based largely on the unique circumstances of a capital sentencing proceeding." (*Caspari, supra,* at p. 392 [114 S.Ct. at p. 954, 127 L.Ed.2d at p. 247].)

The *Caspari* court did not "hold" *Bullington* was limited to capital cases. Rather, it made the observation noted above merely to support its conclusion that "a reasonable jurist reviewing our precedents at the time respondent's conviction and sentence became final would not have considered the application of the Double Jeopardy Clause to a noncapital sentencing proceeding to be dictated by our precedents." (*Caspari, supra,* 510 U.S. at p. 393 [114 S.Ct. at p. 955, 127 L.Ed.2d at p. 248].) Noting that federal and state courts had "reached conflicting holdings on the issue" (*id.* at p. 395 [114 S.Ct. at p.

956, 127 L.Ed.2d at p. 249]), the court concluded "that conflict concerned a 'developmen[t] in the law over which reasonable jurists [could] disagree' " (*ibid.*); accordingly, under *Teague* v. *Lane*, the Eighth Circuit erred in applying its ruling retroactively to defendant's benefit. Significantly for our purposes, the Supreme Court concluded its opinion in *Caspari* by stating: "*we have no occasion to decide whether the Double Jeopardy Clause applies to noncapital sentencing, or whether Missouri's persistent-offender scheme is sufficiently trial-like to invoke double jeopardy protections.*" (*Caspari, supra,* at p. 397 [114 S.Ct. at p. 957, 127 L.Ed.2d at p. 250], italics added.) As is clear, therefore, *Caspari* did not "hold" *Bullington* was limited to capital cases; more to the point, neither did the high court "suggest" it would so hold in the future. The court held only that it had not previously found *Bullington* applicable to noncapital cases, and so the Eighth Circuit's decision to do so for the first time in the context of a final conviction challenged by way of a petition for federal habeas corpus was improper.

*Goldhammer, supra,* 474 U.S. 28, presents similarly unimpressive evidence of a "suggestion" the high court would limit *Bullington* to capital cases. In that case, a *per curiam* opinion decided on summary disposition, the issue was whether, following a successful appeal by a defendant as to 34 of 112 counts of theft and forgery, the state was entitled to a remand for resentencing on other counts for which sentencing had been suspended. In other words, the case did not concern sentence enhancement proceedings, capital or otherwise. In a passage quoting *DiFrancesco, supra,* 449 U.S. at page 134 [101 S.Ct. at page 436], *Goldhammer* noted: "the decisions of this Court 'clearly establish that a sentenc[ing *in a noncapital case*] does not have the qualities of constitutional finality that attend an acquittal." (*Goldhammer, supra,* 474 U.S. at p. 30 [106 S.Ct. at pp. 353-354], italics added, brackets in original.)

It would be a mistake to draw any significant inferences from the bracketed phrase. *DiFrancesco* was decided one year before *Bullington* and, at that time, the general rule was indeed that the high court's "decisions in the sentencing area clearly establish that a sentence does not have the qualities of constitutional finality that attend an acquittal." (*DiFrancesco, supra,* 449 U.S. at p. 134 [101 S.Ct. at p. 436].) The Supreme Court in *Goldhammer* no doubt simply added the bracketed phrase to adjust the quotation to take into account the holding of *Bullington*. At the time *Goldhammer* was decided (1985), as now, the only two cases in which the high court has found a sentencing proceeding subject to the double jeopardy clause have been capital cases. (*Bullington, supra,* 451 U.S. 430; *Rumsey, supra,* 467 U.S. 203.) As we have explained, however, those cases did not *turn* on the fact the death penalty was involved.

*Caspari, supra*, 510 U.S. 383, and *Goldhammer, supra*, 474 U.S. 28, thus provide weak evidence at best for discerning whether the Supreme Court would apply *Bullington*'s analysis to a noncapital case. Moreover, if we are attempting to predict what the high court *would hold* (as opposed to what it *has held*), we must also consider *Lockhart* v. *Nelson, supra*, 488 U.S. 33, a case involving a hearing to determine noncapital sentence enhancements based on prior felony convictions. The *Lockhart* court "assume[d], without deciding," the double jeopardy clause applied to such proceedings. (*Id.* at p. 37, fn. 6 [109 S.Ct. at p. 289].) If the Supreme Court was of the opinion that *Bullington* was limited to capital proceedings, here was an opportunity to say so. If the court felt the double jeopardy clause was wholly inapplicable to sentencing proceedings not involving the death penalty, no reason appears to have decided *Lockhart* at all.

In any event, even assuming for argument *Caspari* and *Goldhammer* contain a "suggest[ion]" (lead opn., *ante*, at pp. 836-837) that the Supreme Court would not now apply the federal double jeopardy clause to noncapital sentencing proceedings, the simple fact is the high court has never actually "held" *Bullington* and *Rumsey* are so limited. Until directed otherwise by a definitive ruling, we are not bound by perceived "suggestions" in Supreme Court case law. We must decide the case before us based on constitutional principles, not predictions of what another court—even a higher court—may do if faced with a justiciable controversy. The Supreme Court having never held *Bullington* and *Rumsey* to be limited to capital cases, I would follow what several courts from around the country have done (see, e.g., *Bohlen* v. *Caspari, supra*, 979 F.2d 109, 113, revd. on other grounds in *Caspari, supra*, 510 U.S. 383; *Durosko* v. *Lewis* (9th Cir. 1989) 882 F.2d 357, 359; *People* v. *Quintana* (Colo. 1981) 634 P.2d 413, 419; *Cooper* v. *State* (Tex.Crim.App. 1982) 631 S.W.2d 508, 513-514 (hereafter *Cooper*); *State* v. *Hennings* (1983) 100 Wn.2d 379 [670 P.2d 256, 259-262] (hereafter *Hennings*) and apply *Bullington*'s "hallmarks of the trial on guilt or innocence" test to this noncapital case to determine whether the federal double jeopardy clause applies here.

### 2. It Is Irrelevant That Defendant's Procedural Protections Are Statutory Rather Than Constitutional

The lead opinion next asserts it is "relevant" that "many of the procedural protections that apply in a Penal Code section 1025 trial rest on statutory, not federal constitutional, grounds." (Lead opn., *ante*, at p. 837.) It is true that many of a criminal defendant's procedural rights in a trial of sentence enhancement allegations find their origins in either a statute or a decision of this court, and not in the federal Constitution. For example, a trial court has

discretion to order a separate hearing to determine the truth of the prior convictions (*People* v. *Calderon* (1994) 9 Cal.4th 69 [36 Cal.Rptr.2d 333, 885 P.2d 83]), and, whether or not the trial is bifurcated, the defendant is entitled to a jury (Pen. Code, § 1025). The sentence enhancements must be pleaded and proved (see, e.g., Pen. Code, §§ 667, subd. (c), 1170.12, subd. (a), 667.5, subd. (d)), and the defendant must answer the charge in open court (Pen. Code, § 1025; see also Pen. Code, § 969½ [when prior conviction allegation is added to complaint after defendant has pleaded guilty, he must be arraigned on the allegations]). The People bear the burden of proving the sentence enhancement beyond a reasonable doubt. (*People* v. *Tenner* (1993) 6 Cal.4th 559, 566 [24 Cal.Rptr.2d 840, 862 P.2d 840]; see also Pen. Code, § 1096 [applying standard of beyond a reasonable doubt to "criminal actions"].)

Despite the nonconstitutional origins of these procedural protections, however, it is the lesson of *Bullington, supra,* 451 U.S. 430, that when a state erects a system in which sentence-enhancing facts are adjudicated in a hearing bearing "the hallmarks of the trial on guilt or innocence" (*id.* at p. 439 [101 S.Ct. at p. 1858]), the federal double jeopardy clause applies. Nothing in *Bullington* or its progeny suggests this analysis is dependent on whether the applicable procedural protections are constitutionally mandated. *Indeed, in Bullington itself, the State of Missouri required procedural protections for its capital defendants that were not grounded in the federal Constitution.* For example, Missouri law provided the jury must both designate in writing which aggravating factors it found true (Mo.Rev.Stat. § 565.012.4 (1978)) and apply a beyond a reasonable doubt standard to proof of those factors (*ibid.*; see *Bullington, supra,* 451 U.S. at p. 434 [101 S.Ct. at pp. 1855-1856]). Neither procedural requirement is constitutionally mandated. (See *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 777-778 [230 Cal.Rptr. 667, 726 P.2d 113].) The lead opinion fails to account for this aspect of *Bullington.*

Accordingly, the lead opinion is simply wrong in claiming the constitutional nature of the protections involved is "relevant" (lead opn., *ante,* at p. 837) to determining whether *Bullington*'s analysis should apply here. Whether or not the procedural protections offered by a state for the adjudication of sentence-enhancing facts are constitutionally mandated is simply not a relevant consideration to the question before us.

### 3. *Bullington Is Not Distinguishable From the Present Case*

The lead opinion next asserts that, any perceived "suggestion" in post-*Bullington* decisions aside, *Bullington* is substantively different from the

present case, because it involved the death penalty, and "the trial-like procedures that regulate imposition of the death penalty find no parallel in noncapital cases." (Lead opn., *ante*, at p. 837.) The lead opinion also finds *Bullington* distinguishable due to "the unique nature . . . of capital sentencing proceedings as compared to prior conviction proceedings." (Lead opn., *ante*, at pp. 839-840.) The lead opinion fails, however, to identify any persuasive reasons, in law or logic, why *Bullington* can or should be limited to capital cases.

Death is indeed different, for the state's execution of a human being as a penal sanction is both final and irreversible, modern society's most serious criminal penalty. (*Lockett* v. *Ohio* (1978) 438 U.S. 586, 604 [98 S.Ct. 2954, 2964, 57 L.Ed.2d 973] (opn. of Burger, C. J.) [the "qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed"]; *Gardner* v. *Florida* (1977) 430 U.S. 349, 358 [97 S.Ct. 1197, 1204, 51 L.Ed.2d 393] (plur. opn. by Stevens, J.) [because of finality and severity of the death penalty, "[i]t is of vital importance to the defendant and the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion"].) For purposes of double jeopardy and applying *Bullington*, however, simply labeling the death penalty as "unique" or "different" obscures the pertinent inquiry, namely, in what relevant way is the death penalty different for purposes of double jeopardy?[2]

Significantly, the *Bullington* court itself did not rely on the mere fact the death penalty was involved. Indeed, it declined to overrule *Stroud, supra*, 251 U.S. 15, a capital case in which a defendant, initially sentenced to life imprisonment, was sentenced to suffer the death penalty on retrial following a reversal and a new trial. The *Stroud* court found no double jeopardy prohibition against imposing the death penalty on retrial. Had *Bullington* held capital cases per se were different, it should have overruled *Stroud*. Instead, *Bullington* distinguished *Stroud* as a case in which the penalty trial—unlike the one in *Bullington*—was not one "like the trial on the question of guilt or innocence." (*Bullington, supra*, 451 U.S. at p. 446 [101 S.Ct. at p. 1862].) "In Stroud, no standards had been enacted to guide the jury's discretion." (*Bullington, supra*, 451 U.S. at p. 439 [101 S.Ct. at p. 1858].) As the Supreme Court of Washington recognized: "Although *Bullington* involved the death penalty sentencing provision, neither the reasoning

---

[2]As Justice Oliver Wendell Holmes observed, frequent repetition of an idea does not necessarily add to its logical force. "It is one of the misfortunes of the law that ideas become encysted in phrases and thereafter for a long time cease to provoke further analysis." (*Hyde* v. *United States* (1912) 225 U.S. 347, 391 [32 S.Ct. 793, 811, 56 L.Ed. 1114] (dis. opn. of Holmes, J.).)

nor the holding in that case depends upon the presence of the death penalty." (*Hennings, supra,* 670 P.2d 256, 260.) Clearly the mere presence of the death penalty is not the key here.

Nor can we say the trial-like procedures that governed Missouri's capital sentencing proceedings are different in any meaningful way from the procedures governing the bifurcated sentencing proceeding used to determine the truth of the prior felony conviction allegation here. In both types of proceedings, the defendant may obtain a separate hearing, must be notified of what the People plan to prove, and is entitled to a jury and to counsel. In both types of proceedings, the trier of fact is guided by established standards and must choose one of two alternative verdicts. In the Missouri proceeding, the choices are death or life imprisonment without parole for 50 years. In the hearing in this case, the jury must decide whether the alleged prior conviction is true or untrue. Like the Missouri capital presentence hearing, the People in the present case are required to prove the alleged sentence enhancement beyond a reasonable doubt. As *Bullington* stated, "[t]he presentence hearing resembled and, indeed, in all relevant respects was like the immediately preceding trial on the issue of guilt or innocence. It was itself a trial on the issue of punishment . . . ." (*Bullington, supra,* 451 U.S. at p. 438 [101 S.Ct. at p. 1858].) Stated differently, the hearing on the prior felony conviction allegations bore "the hallmarks of the trial on guilt or innocence." (*Id.* at p. 439 [101 S.Ct. at p. 1858].)

Accordingly, the trial-like procedures that govern Missouri's capital sentencing hearing are nearly identical to those that apply to the bifurcated proceeding held in this case to determine defendant's prior felony convictions. I thus cannot agree with the lead opinion's contrary conclusion that Missouri's capital procedures "find no parallel in noncapital cases." (Lead opn., *ante,* at p. 837.)

The lead opinion also reasons that whereas *Bullington* held the relative level of embarrassment and anxiety a capital defendant would feel in facing a penalty phase trial was sufficiently comparable to the mental anguish suffered by a criminal defendant in the substantive guilt phase of a criminal trial (*Bullington, supra,* 451 U.S. at p. 445 [101 S.Ct. at pp. 1861-1862]), the same cannot be said for a defendant facing a noncapital sentencing hearing. (Lead opn., *ante,* at pp. 838-839.) From this assessment of the emotional content of the trial experience, the lead opinion concludes *Bullington* should not be extended to noncapital sentencing proceedings.

What is missing from this discussion is a persuasive rationale supporting the bald assertion that a criminal defendant's "anxiety and insecurity" when

facing a possible life sentence as a result of past crimes is not equivalent to that experienced by a defendant being tried for a substantive criminal offense. In this era of "Three-Strikes-and-You're-Out," the mental torment faced by defendants in a bifurcated sentencing hearing to determine the truth of prior conviction allegations seems at least comparable to that faced by defendants at the guilt phase of trial. Such prior convictions, if two or more are sustained, can lead to a *minimum* term in prison of twenty-five years to life, with a maximum term consisting of the balance of the defendant's natural life. (Pen. Code, §§ 667, subd. (e)(2)(A)(i)-(iii), 1170.12, subd. (c)(2)(A)(i)-(iii).) Even if, as in this case, only one qualifying prior felony conviction is alleged, sustaining the prior conviction allegation will require the sentence be doubled in length, essentially adding as much time in prison as defendant received for committing the substantive offense. (Pen. Code, §§ 667, subd. (e)(1), 1170.12, subd. (c)(1).) The lead opinion's comparison of the mental anguish suffered by capital versus noncapital defendants is thus unconvincing.

Finally, the majority finds capital penalty trials are different in kind because the evidence presented in such hearings "usually overlaps or supplements the evidence offered at the guilt phase of the trial," whereas "in a trial of a prior conviction allegation, the factual determinations are generally divorced from the facts of the present offense, and the evidence does not overlap at all." (Lead opn., *ante*, at p. 839; see also conc. opn. of Brown, J., *ante*, at p. 847.) Even if true, this proposed distinction finds no support in *Bullington* whatsoever. I note the majority fails to cite *Bullington* or, indeed, any authority, indicating this evidentiary factor has any relevance to a double jeopardy analysis.

Nor am I convinced the majority is correct as an empirical matter. Although "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding" is an aggravating circumstance in this state's death penalty scheme (see Pen. Code, § 190.3, factor (a)), and a defendant is entitled to argue lingering doubt as a mitigating circumstance (*People* v. *Sanchez* (1995) 12 Cal.4th 1, 77 [47 Cal.Rptr.2d 843, 906 P.2d 1129]), penalty phase evidence is often untethered to the facts of the crime. Instead, such evidence frequently recounts the defendant's past violent criminal conduct and/or explains aspects of the defendant's upbringing or mental health history, evidence, in other words, that does not overlap with the evidence presented at the guilt phase of the trial.

Moreover, even in a bifurcated hearing on prior felony conviction allegations, the evidence must sometimes establish some aspect of the present crime over and above the minimum necessary to obtain a guilty verdict on

the substantive offense. For example, to impose a five-year enhancement term for a prior felony conviction pursuant to Penal Code section 667, subdivision (a), the People must not only prove the existence of a qualifying prior conviction, but must also prove *the present conviction* qualifies as a "serious felony" under Penal Code section 1192.7, subdivision (c). (See *People* v. *Equarte* (1986) 42 Cal.3d 456 [229 Cal.Rptr. 116, 722 P.2d 890] [for assault with a deadly weapon to qualify as "serious felony" eligible for enhancement, state must prove personal weapon use or personal infliction of bodily injury]; *People* v. *Thomas* (1986) 41 Cal.3d 837 [226 Cal.Rptr. 107, 718 P.2d 94] [observing that for burglary to qualify as a "serious felony" eligible for enhancement, state must prove defendant personally used a gun or deadly weapon, or inflicted great bodily injury, or entered a residence].) In such a case, we cannot say "the factual determinations [at the separate hearing] are generally divorced from the facts of the present offense . . . ." (Lead opn., *ante*, at p. 839; see also conc. opn. of Brown, J., *ante*, at p. 847.)

In sum, the majority proffers no persuasive reason to support its assertion that *Bullington*'s "hallmarks of the trial on guilt or innocence" test is limited to capital cases.

### 4. *The Lead Opinion's Other Arguments Are Unpersuasive*

The lead opinion announces other reasons for declining to apply the federal double jeopardy clause in this case, but none is persuasive. For example, the lead opinion asserts that "a criminal defendant is not entitled as a federal constitutional matter to a trial, formal or informal, of sentencing issues, even when the sentence turns on factual determinations such as the existence of prior convictions." (Lead opn., *ante*, at p. 832.) Because California thus could choose to provide *very few* procedural protections for sentencing allegations, reasons the lead opinion, it could certainly choose to provide less than full protection. From this, the lead opinion concludes "a trial of sentencing allegations *arguably* need not provide double jeopardy protection." (*Id.* at p. 833, italics added.)

This argument is beside the point. While it may be true our Legislature could choose to provide fewer procedural protections for sentence enhancements (see *People* v. *Vera* (1997) 15 Cal.4th 269, 286 [62 Cal.Rptr.2d 754, 934 P.2d 1279] (dis. opn. of Werdegar, J.)), it has not done so. If anything, legislative action has moved in the opposite direction, ensuring a high degree of procedural protection for defendants charged with sentence-enhancing allegations. (See, e.g., Pen. Code, §§ 667, subd. (c) [prior convictions under legislative Three Strikes law must be "pled and proved"], 1170.12, subd. (a) [same under initiative Three Strikes law], 667.5, subd. (d) [prior prison term

enhancements "shall not be imposed unless they are charged and admitted or found true"], 1025 [right to jury for prior felony conviction enhancements], 1102 [rules of evidence apply to criminal "actions"]; see also Pen. Code, § 190.3 [in penalty phase of capital case, evidence of prior criminal activity shall not be admitted "for an offense for which the defendant was prosecuted and acquitted"].)

The lead opinion also suggests federal double jeopardy cannot apply here because the Fifth Amendment specifically refers to "the offense," and "[t]he [double jeopardy] clause makes no express reference to sentencing determinations." (Lead opn., *ante*, at p. 834.) This argument is belied by *Bullington* itself, for the high court applied the federal double jeopardy clause to the Missouri capital sentencing trial although no "offense" was involved therein. Clearly any suggestion the federal double jeopardy clause is limited to criminal "offenses" is incorrect.

### 5. *Authority From the Federal Circuits and Other States*

Citing several cases from the various federal circuits and other states, the majority admits these courts "are divided as to whether the federal double jeopardy clause applies to proceedings analogous to the one here." (Lead opn., *ante*, at pp. 839-840; see also conc. opn. of Brown, J., *ante*, at p. 847.) As the lead opinion concedes, several federal circuits and state courts have profitably applied the *Bullington* "hallmarks of the trial on guilt or innocence" test to find the federal double jeopardy clause applicable to noncapital sentencing proceedings. For example, in *Briggs* v. *Procunier* (5th Cir. 1985) 764 F.2d 368 (hereafter *Briggs*), Texas indicted the defendant for burglary and alleged two prior felony convictions which, if proved, required he be sentenced to life in prison. After a jury found the defendant guilty of the charged burglary, the state dismissed the charged prior convictions, citing proof problems. The defendant sought a new trial and the state joined the motion. When it was granted, the state again indicted the defendant for burglary. This time, however, the state charged two different prior felony convictions to enhance the sentence. (*Id.* at p. 369.) The prior felonies were found true and the defendant was sentenced to life imprisonment.

The Fifth Circuit Court of Appeals applied the *Bullington* "hallmarks of the trial on guilt or innocence" test to reverse the district court's denial of relief on habeas corpus. "Like the death-sentencing procedure discussion in Bullington v. Missouri, 451 U.S. 430 [101 S.Ct. 1852, 68 L.Ed.2d 270] (1981), the Texas scheme requires the state to prove at trial, beyond a reasonable doubt, the predicate facts, two prior convictions, necessary for the imposition of the harsher sentence. 'The two prior convictions must be

alleged in the indictment, and upon review the allegations are treated the same as allegations of the elements of a substantive offense.' [Citation.] Therefore, if the state fails to introduce sufficient evidence of the defendant's status as an habitual offender at a first trial, the Double Jeopardy Clause prohibits the sentencing of the defendant as an habitual offender at a second trial." (*Briggs, supra,* 764 F.2d at p. 371.)

The Supreme Court of Washington reached the same conclusion in *Hennings, supra,* 670 P.2d 256. The defendant in *Hennings* was charged with robbery and with being a habitual criminal under Washington's habitual offender law. He ultimately pleaded guilty to robbery, but the trial court dismissed the habitual criminal charge, concluding the People failed to prove defendant's guilty plea in the prior conviction matter was knowingly and voluntarily obtained, a statutory requirement under Washington law. (*Id.* at p. 257.)

The Washington high court held double jeopardy precluded the People from recharging and retrying the habitual criminal allegation. The court explained that, like the capital proceeding at issue in *Bullington, supra,* 451 U.S. 430, a habitual offender determination under Washington law takes place in a separate proceeding in which the state bears the burden of proof beyond a reasonable doubt. In addition, should the allegation be proved, the range of penalties is strictly circumscribed: If the sentence is not suspended, the habitual offender must be sentenced to life imprisonment; there is no other sentence. (*Hennings, supra,* 670 P.2d at p. 258.) The "similarities [between *Bullington* and the Washington habitual offender law] indicate that under *Bullington* double jeopardy principles should apply to Washington's habitual criminal proceedings." (*Hennings, supra,* 670 P.2d at p. 260.)

As illustrated by *Briggs, supra,* 764 F.2d 368, and *Hennings, supra,* 670 P.2d 256, the majority rule that has emerged from the federal circuit courts and state high courts is this: *Bullington*'s "hallmarks of the trial on guilt or innocence" test is the applicable standard to determine whether noncapital sentencing proceedings are subject to the federal double jeopardy clause. As in *Briggs* and *Hennings,* many courts have found double jeopardy applies to bar retrial of a noncapital sentencing allegation because the state law at issue bore the hallmarks of a trial on guilt. (In addition to *Briggs, supra,* 764 F.2d 368 [Fifth Circuit], and *Hennings, supra,* 670 P.2d 256 [Washington], see, e.g., *Bohlen* v. *Caspari, supra,* 979 F.2d at p. 113, revd. on other grounds in *Caspari, supra,* 510 U.S. 383 [8th Circuit, interpreting Missouri habitual offender law]; *Nelson* v. *Lockhart* (8th Cir. 1987) 828 F.2d 446, 447-448, revd. on other grounds, *Lockhart* v. *Nelson, supra,* 488 U.S. 33 [interpreting Arkansas habitual offender law]; *Durosko* v. *Lewis, supra,* 882 F.2d at p. 359

[Ninth Circuit interpreting Arizona law]; *People* v. *Quintana, supra,* 634 P.2d at p. 419 [Colorado]; *Cooper, supra,* 631 S.W.2d at pp. 513-514 [Texas]; *Ex Parte Augusta* (Tex.Crim.App. 1982) 639 S.W.2d 481, 484 [following *Cooper*]; cf. *DeBussi* v. *State* (Miss. 1984) 453 So.2d 1030, 1032-1033 [applying a *Bullington*-type analysis to conclude double jeopardy under the Mississippi Constitution barred retrial of habitual offender allegation].)

Other courts have applied *Bullington*'s "hallmarks of the trial on guilt or innocence" test to noncapital sentencing proceedings to come to a contrary conclusion, i.e., that the sentencing law at issue did not bear sufficient similarity to a trial on the question of guilt. Accordingly, these courts have found double jeopardy did not prohibit a retrial under the particular statutory scheme at issue. For example, in *Wilmer* v. *Johnson* (3d Cir. 1994) 30 F.3d 451 (hereafter *Wilmer*), a challenge to a Pennsylvania drug trafficker sentence enhancement scheme, the appellate court applied the *Bullington* "hallmarks of the trial on guilt or innocence" test to find double jeopardy did not apply. Noting the state was permitted to appeal the sentence in the particular statutory sentencing scheme at issue, the *Wilmer* court concluded there would be no second "trial." More importantly, only a preponderance of the evidence test was applicable. "The lower standard of proof signifies a more lax procedure which in turn signifies that a hearing is not, in the *Bullington* calculus, trial-like." (*Wilmer, supra,* 30 F.3d at pp. 457-458.) Contrary to the suggestion of the majority that *Wilmer* held double jeopardy could not apply to noncapital sentencing because of the absence of the death penalty, the *Wilmer* court applied *Bullington*'s "hallmarks of the trial on guilt or innocence" test and concluded the state sentencing scheme at issue there was insufficiently analogous to a trial on guilt.

*People* v. *Levin* (1993) 157 Ill.2d 138 [191 Ill.Dec. 72, 623 N.E.2d 317], which dealt with the Illinois habitual offender statute, also applied the *Bullington* analysis to a noncapital case before finding double jeopardy did not apply. "The legislature has fashioned the habitual-criminal sentencing proceeding to be less formalized than a trial. Indeed, the paucity of due process protections at sentencing supports the conclusion that the legislature has deemed the defendant's interests at this stage of the proceeding to warrant fewer of those protections than at trial. We conclude that the separate hearing procedure under our Act bears insufficient formalities of a trial to render that factor analogous to the separate hearing procedure in *Bullington* and to this defendant's trial on the issue of guilt." (623 N.E.2d at p. 325.) In other words, the separate hearing held pursuant to Illinois's habitual offender statute does not bear the hallmarks of a trial on guilt, so double jeopardy does not apply.

Other cases applying the *Bullington* "hallmarks of the trial on guilt or innocence" test to noncapital sentencing proceedings and finding such hallmarks absent include *Woodall* v. *U.S.* (8th Cir. 1995) 72 F.3d 77, 79-80 (interpreting federal Armed Career Criminal Act), *State* v. *Sowards* (1985) 147 Ariz. 156 [709 P.2d 513, 515] (Arizona), *State* v. *Cobb* (Mo. 1994) 875 S.W.2d 533, 535 (hereafter *Cobb*) (Missouri),[3] *Fitzpatrick* v. *State* (1981) 194 Mont. 310 [638 P.2d 1002, 1017] (Montana), and *People* v. *Sailor* (1985) 65 N.Y.2d 224 [491 N.Y.S.2d 112, 480 N.E.2d 701] (New York). (See also *State* v. *Avila* (1985) 147 Ariz. 330 [710 P.2d 440, 445-446] [quoting *Sowards* with approval]; cf. *State* v. *Ledbetter* (1997) 240 Conn. 317 [692 A.2d 713, 717-718] [suggesting *Bullington* applies to state's noncapital persistent offender law, but concluding defendant waived the claim].) All of these cases recognize the applicable test in determining whether double jeopardy applies to bar retrial is whether the noncapital sentencing scheme bears sufficient similarity to a trial on guilt so that one can conclude, as in *Bullington*, that a not true finding operates as an "acquittal" of the sentencing allegation. (See, e.g., *Woodall* v. *U.S.*, *supra*, 72 F.3d at p. 79 [emphasizing government's burden of proof is only by a preponderance of evidence to conclude double jeopardy does not apply].)

The majority's attempt (lead opn., *ante*, at pp. 839-840; conc. opn. of Brown, J., *ante*, at p. 847) to distinguish these cases wholesale as insufficiently impressed with the "unique nature and constitutional origins" of the death penalty is flawed, relying as it does on an unjustified embellishment of the Supreme Court's rationale in *Bullington*. Although *Bullington* involved a capital sentencing scheme, the mere possibility of the death penalty was not cited by the *Bullington* court as central to its rationale. As noted above, the Supreme Court of Washington has explicitly rejected the notion that *Bullington* was premised on the fact the death penalty was there involved. (See *Hennings*, *supra*, 670 P.2d at p. 260; see also *Linam* v. *Griffin* (10th Cir. 1982) 685 F.2d 369, 376-377 (conc. opn. of Anderson, J.) [fact death penalty

---

[3]Although the lead opinion cites this case in support, and admittedly some language in the *Cobb* opinion suggests the court found Missouri's noncapital persistent offender law distinguishable from the sentencing scheme in *Bullington* on the ground the Missouri law did not involve the death penalty, the Missouri Supreme Court also had this to say: "In the sentencing of a persistent offender, the trial court's discretion is essentially unfettered. The judge has a wide range of punishment from which to choose and is not inhibited by explicit standards imposed by statute. In addition, as in *DiFrancesco*, the choice presented the trial judge in sentencing persistent offenders is far broader than that faced by a jury in sentencing a defendant to death. For the same reasons that *Bullington* is distinguishable from *DiFrancesco*, *Pearce*, *Chaffin* and *Stroud*, *Bullington* is distinguishable from this case. Therefore, applying the rationale of *Bullington*, double jeopardy does not attach to Missouri's noncapital persistent offender sentencing." (*Cobb*, *supra*, 875 S.W.2d at p. 535.) It thus appears the *Cobb* court applied the *Bullington* analysis to conclude Missouri's persistent offender law did not bear the hallmarks of a trial on guilt or innocence.

was involved in *Bullington* was "not relied on nor even articulated by the Supreme Court as a basis for its holding" (italics omitted)].) To the extent the majority relies on this "death-penalty-only" view of *Bullington*, it relies on an augmentation of that decision's rationale that appears nowhere in the body of the opinion itself.

The majority relies on cases which, admittedly, find *Bullington* does not apply to noncapital sentencing proceedings. In addition to espousing the minority rule, however, many of these cases employ faulty reasoning or announce their interpretation of *Bullington* in dicta. For example, in *State v. Aragon* (1993) 116 N.M. 267 [861 P.2d 948], cited by the lead opinion in support (lead opn., *ante*, at p. 840), the New Mexico Supreme Court found that double jeopardy did not attach to New Mexico's habitual offender proceedings because the law does not create a substantive criminal offense. (See 861 P.2d at pp. 950-951 ["we have determined that habitual offender proceedings do not involve a determination of guilt of *any offense*" (italics added)], 953 ["double jeopardy [does] not attach to the habitual offender proceeding . . . because . . . there was no prosecution of *an offense*" (italics added)].) This reasoning misreads *Bullington*, for, as explained, *ante*, the jury in the Missouri capital sentencing trial in *Bullington* also did not try a separate "offense." Instead, the *Bullington* jury was deciding between life or death as an appropriate sentence. Clearly, whether or not a sentencing scheme delineates an "offense" is not the test. Accordingly, *Aragon*'s reasoning is flawed.

*Denton v. Duckworth* (7th Cir. 1989) 873 F.2d 144 (hereafter *Denton*), also cited by the majority in support (lead opn., *ante*, at p. 840; conc. opn. of Brown, J., *ante*, at p. 847), contains the same analytical flaw (873 F.2d at p. 148 [Indiana's habitual offender statute "*does not create a separate offense* . . . ." (italics added)]), but is unpersuasive for a more basic reason. In *Denton*, the defendant was convicted of rape and was also found to be a habitual offender under Indiana law based on his conviction of four prior unrelated felonies. After his rape conviction, one of the four prior felony convictions was vacated by a different court. The state moved to retry the habitual offender allegation with the remaining three prior felony allegations (only two were necessary), deleting the now-vacated conviction. In these circumstances, the court held retrial was permissible.

*Denton* thus does not present a situation in which the state, with all its resources, failed to present sufficient evidence to convict. Instead, the matter was one of trial error for which the federal double jeopardy clause is inapplicable. (*Burks, supra,* 437 U.S. at pp. 15-16 [98 S.Ct. at pp. 2149-2150].) As even the *Denton* court opined: "This clearly is a case of 'trial

error,' and not of insufficiency of the evidence." (*Denton, supra,* 873 F.2d at p. 148.) Any discussion in *Denton* of the application of *Bullington* was thus dictum.

*Linam* v. *Griffin, supra,* 685 F.2d 369, also declares its interpretation of *Bullington* in dictum. In *Linam,* the Tenth Circuit Court of Appeals found a state appellate court's reversal of a noncapital sentence enhancement "meets the Burks Court's definition of trial error and is not a true finding of inadequacy of evidence." (*Id.* at p. 373.) Because only trial error was present in *Linam,* no double jeopardy bar to retrial applied irrespective of that court's views on *Bullington.* (See generally, *Bohlen* v. *Caspari, supra,* 979 F.2d at p. 114 [concluding *Linam* and *Denton* are distinguishable as cases involving trial error and not insufficiency of evidence]; *Carpenter* v. *Chapleau* (6th Cir. 1996) 72 F.3d 1269, 1276 (dis. opn. of Moore, J.) [finding *Denton*'s and *Linam*'s discussion of *Bullington* to be dictum].) The majority's reliance on dicta in *Denton, supra,* 873 F.2d 144, and *Linam, supra,* 685 F.2d 369, is thus misplaced.

The majority rule emerging from the federal circuit courts and the high courts from our sister states is this: The test to determine whether the federal double jeopardy clause applies to bar multiple retrials of noncapital sentencing determinations is *Bullington*'s "hallmarks of the trial on guilt or innocence" test. The cases cited by the majority in support of its contrary position delineate a minority rule, and are for the most part weakly reasoned or announce their interpretation of *Bullington* in dictum. Because I find the majority rule better reasoned and thus more persuasive, I would apply *Bullington*'s "hallmarks of the trial on guilt or innocence" test to the facts of this case.

### C.   *Applying Bullington to This Case*

*Bullington* found the federal double jeopardy clause applied to Missouri's capital sentencing hearing because that hearing bore the "hallmarks of the trial on guilt or innocence." The high court found it significant that the defendant enjoyed the right to a separate hearing and to a jury and that the jury was not granted broad discretion to choose an appropriate punishment, but was instead required to choose between two alternates authorized by statute. Perhaps most importantly, the prosecution bore the burden of establishing necessary facts beyond a reasonable doubt. "The presentence hearing resembled and, indeed, in all relevant respects was like the immediately preceding trial on the issue of guilt or innocence. It was itself a trial on the issue of punishment so precisely defined by the Missouri statutes." (*Bullington, supra,* 451 U.S. at p. 438 [101 S.Ct. at p. 1858].)

These same "hallmarks of the trial on guilt or innocence" apply to a trial on a sentence enhancement allegation. In such a hearing, the People bear the burden of proving the sentence enhancement beyond a reasonable doubt (*People* v. *Tenner, supra,* 6 Cal.4th at p. 566; see also Pen. Code, § 1096 [applying standard of beyond a reasonable doubt to "criminal actions"]), and the defendant is entitled to a jury (Pen. Code, § 1025). The sentence enhancement must be pleaded and proved (see, e.g., Pen. Code, §§ 667, subd. (c); 1170.12, subd. (a), 667.5, subd. (d)), and the defendant must answer the charge in open court. (Pen. Code, § 1025; see also Pen. Code, § 969½ [requiring defendant be arraigned on a prior conviction allegation added to the complaint after defendant has pleaded guilty].) The jury is limited to two alternatives (finding the allegation true or untrue) and is not authorized to choose among a wider array of sentencing choices. The trial court has discretion to order a separate hearing to determine the truth of the prior convictions (*People* v. *Calderon, supra,* 9 Cal.4th 69), but in any event, the defendant is entitled to a contested "trial" on the enhancement allegations, including the right to present evidence.

This "trial" on sentence enhancement allegations may be profitably contrasted with a "traditional" sentencing hearing, in which the People bear no burden of proof, the trial court can receive evidence from outside of court (such as a probation report), the trial court wields broad discretion to fashion a sentence appropriate to the defendant's crime, and, of course, a defendant has no right to a jury. As in *Bullington,* the "trial" on the sentence enhancement allegation is for all intents and purposes identical to the preceding trial on the question of the defendant's guilt or innocence of the substantive criminal charges. Under these circumstances, *Bullington* compels the conclusion the federal double jeopardy clause applies to this case to bar retrial of defendant's prior felony conviction sentence enhancement.

## II. DOUBLE JEOPARDY UNDER THE CALIFORNIA CONSTITUTION

### A. *Relying on the California Constitution*

Irrespective of whether the majority is correct regarding the nonapplicability of the federal double jeopardy clause to this case, I conclude retrial of the prior felony conviction allegation is prohibited by the state constitutional double jeopardy clause. (Cal. Const., art. I, § 15.) Our state counterpart to the federal double jeopardy clause first appeared in the California Constitution of 1849, article I, section 8, where the language tracked the federal guarantee. The provision was moved essentially unchanged to article I, section 13 in the California Constitution of 1879, and finally came to rest in article I, section 15, of the present California Constitution; it provides: "Persons may not twice be put in jeopardy for the same offense . . . ."

Article I, section 24 of the state charter, added by popular vote in 1974, is also relevant to our discussion; it provides: "Rights guaranteed by this Constitution are not dependent on those guaranteed by the United States Constitution." That section was amended by Proposition 115 to state the following qualification: "In criminal cases the rights of a defendant to . . . not be placed twice in jeopardy for the same offense . . . shall be construed by the courts of this state in a manner consistent with the Constitution of the United States. This [state] Constitution shall not be construed by the courts to afford greater rights to criminal defendants than those afforded by the Constitution of the United States . . . ." This latter provision was invalidated, however, in *Raven v. Deukmejian* (1990) 52 Cal.3d 336 [276 Cal.Rptr. 326, 801 P.2d 1077] (hereafter *Raven*), as an improper revision of the state Constitution.

In light of the holding in *Raven* we remain free to continue our long-standing and constitutionally authorized practice, in appropriate situations, of interpreting our state Constitution to grant greater protection to state residents than would be afforded by the high court under the federal Constitution. It is true, as the lead opinion notes, that we have previously explained there must be " 'cogent reasons . . . before a state court in construing a provision of the state Constitution will depart from the construction placed by the Supreme Court of the United States on a similar provision in the federal Constitution.' " (*Raven, supra,* 52 Cal.3d at p. 353, quoting *Gabrielli v. Knickerbocker* (1938) 12 Cal.2d 85, 89 [82 P.2d 391].) This admonishment finds no application here, however, for, as explained, *ante,* the Supreme Court has never ruled on the question whether the federal double jeopardy clause applies to noncapital sentence enhancements. There is thus no federal construction from which to depart.

Significantly, we most recently faced this federal versus state Constitution question in a case specifically posing a double jeopardy question; there, we reaffirmed that "the California Constitution is a document of independent force and effect that may be interpreted in a manner more protective of defendants' rights than that extended by the federal Constitution." (*People v. Fields* (1996) 13 Cal.4th 289, 298 [52 Cal.Rptr.2d 282, 914 P.2d 832].)

Indeed, good reasons exist to rely on our state Constitution even before we consider whether the federal Constitution applies here. It is hornbook law that at the time the Bill of Rights was ratified in 1791, and until the 1920's, the Bill of Rights was not understood to apply against the states at all. (*Barron v. Baltimore* (1833) 32 U.S. (7 Pet.) 243 [8 L.Ed. 672].) Due to the selective nature of the incorporation doctrine, which arose in this century (see generally, Nowak & Rotunda, Constitutional Law (5th ed. 1995) § 10.2,

pp. 339-342), application to the states of the various portions of the Bill of Rights was addressed judicially in a sequential manner. The federal constitutional guarantee not to be placed twice in jeopardy was not held applicable to state prosecutions until *1969. (Benton* v. *Maryland, supra,* 395 U.S. 784.) Until that year, we had always relied solely on our own state Constitution to protect our residents from being placed twice in jeopardy.

Moreover, other than the rather obscure provisions in article I, section 10 of the federal Constitution (prohibitions of ex post facto laws, bills of attainder, interference with contracts), the Constitution placed no limitation on states in the area of personal liberties until ratification of the Fourteenth Amendment in 1868, almost two decades after California was granted statehood. From this bit of history, we can draw two conclusions. First, "[f]or most of the life of this nation the Federal Constitution offered no protection for the personal, religious, intellectual and political rights of its citizens in their relations with state and local government. In California those protections were provided by the Declaration of Rights—Article I of the California constitution—which contains provisions much like those of the Federal Bill of Rights." (Falk, *The Supreme Court of California 1971-1972, Foreword, The State Constitution: A More Than "Adequate" Nonfederal Ground* (1973) 61 Cal.L.Rev. 273, 274, original capitalization (hereafter Falk article).) Second, and more important for our purposes, for the majority of this state's political life, *it has been the state, not federal, Constitution that protected the personal liberties—specifically the right to not be placed twice in jeopardy—of Californians.*

If we go back even further in history, we find that state constitutional protections of individual liberties are not even derived from the Bill of Rights; rather, the reverse is true. "The lesson of history is otherwise; indeed, the drafters of the federal Bill of Rights drew upon corresponding provisions in the various state constitutions. Prior to the adoption of the federal Constitution, each of the rights eventually recognized in the federal Bill of Rights had previously been protected in one or more state constitutions." (Brennan, *State Constitutions and the Protection of Individual Rights* (1977) 90 Harv. L.Rev. 489, 501.) When drafting the Declaration of Rights in our state Constitution, first in 1849 and again in 1879, "the drafters largely looked to the constitutions of the other states, rather than the federal Constitution, as potential models." (*Raven, supra,* 52 Cal.3d at p. 353.) There is thus good reason to look first to our state Constitution for guidance.

In interpreting the extent of various rights of personal liberty, this court has in the past eschewed the federal document and relied on the state Constitution in two distinct situations. First, we sometimes relied on our

state Constitution to diverge from the high court's interpretation of an analogous federal constitutional provision when we concluded the high court did not provide sufficient protection for individual liberties. For example, we held in *People* v. *Brisendine* (1975) 13 Cal.3d 528, 545-552 [119 Cal.Rptr. 315, 531 P.2d 1099] that a search incident to a lawful arrest must be justified by a rule of reasonableness, contrary to the Supreme Court's decision in *United States* v. *Robinson* (1973) 414 U.S. 260 [94 S.Ct. 494, 38 L.Ed.2d 427], which held a search incident to a lawful arrest was per se reasonable.[4] (See cases collected at *Raven, supra,* 52 Cal.3d at p. 354; see generally, Grodin et al., The California State Constitution (1993) pp. 21-26 & accompanying notes; Falk article, *supra,* 61 Cal.L.Rev. at pp. 277-280 & accompanying notes.)

Although we invalidated in *Raven* that portion of Proposition 115 tying state constitutional interpretation to the federal Constitution, we nonetheless remain cognizant the electorate expressed displeasure with state constitutional interpretations that granted criminal defendants greater procedural rights than are required under the federal Constitution. Accordingly, although we remain free, in light of *Raven,* to continue to interpret the state Constitution more expansively than its federal counterpart, we have declared there must be " 'cogent reasons' " to do so. (*Raven, supra,* 52 Cal.3d at p. 353.) Here, however, we are not presented with such a situation because, as explained, *ante,* the United States Supreme Court has never ruled on the precise issue before us.

We are, rather, presented with the second type of situation in which we historically have interpreted the state Constitution to provide protection of individual liberties, namely, *when no United States Supreme Court authority had yet emerged.* For example, in an opinion by Justice Mosk, we held the California Constitution guaranteed the right to counsel for persons charged with misdemeanors. (*In re Johnson* (1965) 62 Cal.2d 325, 329 [42 Cal.Rptr. 228, 398 P.2d 420].) At the time, no federal constitutional rule had yet emerged. Seven years later, the Supreme Court found a federal constitutional right to counsel in misdemeanor cases, at least where imprisonment was a possibility. (*Argersinger* v. *Hamlin* (1972) 407 U.S. 25 [92 S.Ct. 2006, 32 L.Ed.2d 530].)

In the absence of federal constitutional authority binding us, we clearly are free to look to our state Constitution. Indeed, reliance on the state

---

[4]Of course, *Brisendine* and other state-law-based search-and-seizure cases were superseded by the enactment of Proposition 8. (See Cal. Const., art. I, § 28, subd. (d) [right to truth-in-evidence provision]; *In re Lance W.* (1985) 37 Cal.3d 873 [210 Cal.Rptr. 631, 694 P.2d 744] [upholding same].)

Constitution is preferable here, for not only has the United States Supreme Court never specifically ruled on the applicability of the federal double jeopardy clause to noncapital sentencing proceedings or sentence enhancements, it has had several opportunities to address the issue and has declined each time. (*Caspari, supra,* 510 U.S. 383, *Lockhart* v. *Nelson, supra,* 488 U.S. 33; *Hunt* v. *New York, supra,* 502 U.S. 964 (opn. of White, J., dis. from denial of cert.); see also *Carpenter* v. *Chapleau, supra,* 72 F.3d 1269, cert. den. __ U.S. __ [117 S.Ct. 108, 136 L.Ed.2d 61] (1996); *Wilmer, supra,* 30 F.3d 451, cert. den. 513 U.S. 970 [115 S.Ct. 439, 130 L.Ed.2d 350] (1994); *Denton, supra,* 873 F.2d 144, cert. den. 493 U.S. 941 [110 S.Ct. 341, 107 L.Ed.2d 330] (1989); *Durosko* v. *Lewis, supra,* 882 F.2d 357, cert. den. 495 U.S. 907 [110 S.Ct. 1930, 109 L.Ed.2d 294] (1990); *Linam* v. *Griffin, supra,* 685 F.2d 369, cert. den. 459 U.S. 1211 [103 S.Ct. 1207, 75 L.Ed.2d 447] (1983); *People* v. *Levin, supra,* 623 N.E.2d 317, cert. den. *sub nom. Levin* v. *Illinois,* 513 U.S. 826 [115 S.Ct. 94, 130 L.Ed.2d 44] (1994); *People* v. *Sailor, supra,* 491 N.Y.S.2d 112 [480 N.E.2d 701, cert. den. *sub nom. Sailor* v. *New York,* 474 U.S. 982 [106 S.Ct. 387, 88 L.Ed.2d 340] (1985).) Not only, therefore, are we left with no definitive holding from the high court, we cannot anticipate that court will soon resolve the question. This uncertain state of affairs provides " 'cogent reasons' " (*Raven, supra,* 52 Cal.3d at p. 353), were they needed, for us to rely on our state Constitution. (See *Ex Parte Augusta, supra,* 639 S.W.2d at p. 485 [applying double jeopardy under Texas Constitution to noncapital sentencing proceeding]; *DeBussi* v. *State, supra,* 453 So.2d 1030, 1032-1033 [applying a *Bullington*-type analysis to conclude double jeopardy under the Mississippi Constitution barred retrial of habitual offender allegation].)

B.   *Double Jeopardy Under the State Constitution*

When double jeopardy principles are involved, history shows we have not felt compelled to walk in the footprints left by United States Supreme Court precedent. For example, in *Cardenas* v. *Superior Court* (1961) 56 Cal.2d 273 [14 Cal.Rptr. 657, 363 P.2d 889, 100 A.L.R.2d 371], we held double jeopardy would preclude retrial following a mistrial granted over the defendant's objection. Although a retrial would have been allowed under the federal Constitution (*Gori* v. *United States* (1961) 367 U.S. 364 [81 S.Ct. 1523, 6 L.Ed.2d 901]), we simply stated: "[the federal] holding [in *Gori*] does not accord with the uniform construction placed by this court upon the jeopardy provision of the California Constitution. . . ." (*Cardenas, supra,* at p. 276.) We explicitly reaffirmed *Cardenas* in *Curry* v. *Superior Court* (1970) 2 Cal.3d 707, 715-716 [87 Cal.Rptr. 361, 470 P.2d 345].

*People* v. *Henderson* (1963) 60 Cal.2d 482 [35 Cal.Rptr. 77, 386 P.2d 677] (hereafter *Henderson*) is similar. In *Henderson,* the defendant was convicted, on his plea of guilty, of first degree murder and sentenced to life

imprisonment. On appeal, the court reversed for trial court error in permitting the defendant to withdraw his original plea of not guilty. On remand, the defendant was again convicted; this time, he was sentenced to suffer the death penalty. On appeal in this court, the defendant argued imposition of the death penalty on retrial violated his right against double jeopardy as set forth in article I, then section 13 of the state Constitution.

This court agreed. Noting that in *Stroud, supra,* 251 U.S. 15, the Supreme Court held the federal double jeopardy clause did not prohibit imposition of the death penalty after a retrial for a defendant originally sentenced to life imprisonment, this court found the state Constitution marked out a different path: "A defendant's right of appeal from an erroneous judgment is unreasonably impaired when he is required to risk his life to invoke that right. Since the state has no interest in preserving erroneous judgments, it has no interest in foreclosing appeals therefrom by imposing unreasonable conditions on the right to appeal." (*Henderson, supra,* 60 Cal.2d at p. 497.)

The Supreme Court followed *Stroud* with *North Carolina* v. *Pearce, supra,* 395 U.S. 711, a 1969 noncapital case, holding a greater sentence after a retrial does not violate the federal due process clause. We again followed our own path, applying to noncapital cases the state constitutional double jeopardy rule set forth in *Henderson, supra,* 60 Cal.2d 482. (*People* v. *Hood* (1969) 1 Cal.3d 444, 459 [82 Cal.Rptr. 618, 462 P.2d 370] [following *Henderson* but not mentioning *Pearce*].) As one Court of Appeal observed: "Although presented with . . . the opportunity to [overrule *Henderson*] . . . , the court has never retreated from the rationale or holding of *Henderson.*" (*People* v. *Superior Court (Harris)* (1990) 217 Cal.App.3d 1332, 1337 [266 Cal.Rptr. 563], citing inter alia, *People* v. *Collins* (1978) 21 Cal.3d 208, 216-217 [145 Cal.Rptr. 686, 577 P.2d 1026]; *People* v. *White* (1976) 16 Cal.3d 791, 802 [129 Cal.Rptr. 769, 549 P.2d 537]; *People* v. *Serrato* (1973) 9 Cal.3d 753, 763-764 [109 Cal.Rptr. 65, 512 P.2d 289], disapproved on other grounds in *People* v. *Fosselman* (1983) 33 Cal.3d 572, 583, fn. 1 [189 Cal.Rptr. 855, 659 P.2d 1144]; *Curry* v. *Superior Court, supra,* 2 Cal.3d at pp. 716-717; *People* v. *Hood, supra,* 1 Cal.3d at p. 459.)

In *People* v. *Comingore* (1977) 20 Cal.3d 142 [141 Cal.Rptr. 542, 570 P.2d 723], the defendant, who had stolen a car in California and driven it to Oregon, was convicted in Oregon of unauthorized use of a vehicle. Upon his release, he was prosecuted in California for grand theft auto based on essentially the same acts that gave rise to the Oregon conviction. Although the California prosecution would have been permissible under the high court's interpretation of the Fifth Amendment double jeopardy clause (see *Abbate* v. *United States* (1959) 359 U.S. 187 [79 S.Ct. 666, 3 L.Ed.2d 729]),

we held Penal Code section 793, a *statute* implementing double jeopardy principles, prohibited the California trial as it was predicated on the same facts that formed the basis of the Oregon trial. We did not expressly mention the state Constitution, but merely stated the rule in *Abbate* "does not preclude a state from providing greater double jeopardy protection than is provided by the federal Constitution . . . ." (*Comingore, supra,* 20 Cal.3d at p. 145.) Although *Comingore* is not unequivocally a state *constitutional* (as opposed to state *statutory*) case, the principles at work seem congruent, especially because Penal Code section 793 merely implements the state constitutional double jeopardy guarantee.

In light of this court's strong history of relying on the state Constitution as a document of independent force in the double jeopardy area, I would rely on that document to resolve this case.

C. *Applicability of State Double Jeopardy Principles to Sentence Enhancement Allegations*

As the lead opinion concedes, we recently determined double jeopardy principles precluded retrial of a firearm use enhancement allegation, charged pursuant to Penal Code section 12022.5, where the defendant's jury had previously found the allegation not true. (*People* v. *Superior Court (Marks)* (1991) 1 Cal.4th 56, 78, fn. 22 [2 Cal.Rptr.2d 389, 820 P.2d 613] (hereafter *Marks*); cf. *People* v. *Santamaria* (1994) 8 Cal.4th 903, 910 [35 Cal.Rptr.2d 624, 884 P.2d 81] ["The parties agree(d) that the jury's 'not true' finding on the knife-use enhancement allegation precludes retrial of that allegation"].) Noting the jury had found the allegation the defendant personally used a firearm "not true," we held "[t]he jury's rejection constituted an express acquittal on the enhancement and forecloses any retrial." (*Marks, supra,* 1 Cal.4th at p. 78, fn. 22.)

Because *Marks* is but a few years old and applied double jeopardy principles to a finding on a sentence enhancement, one might assume it provides relevant authority to decide this case. The lead opinion, however, posits two reasons why it believes *Marks* is irrelevant to the proper resolution of this case. First, the lead opinion opines that *Marks* relies on a line of cases that are based on a state constitutional rule of double jeopardy that precludes penalizing a defendant with a longer sentence following a successful appeal of his or her conviction. (Lead opn., *ante,* at p. 843.)[5] Second, the lead opinion asserts that "because *Marks* included no analysis of the complex issues we address in this case, we think a narrow reading of *Marks* is appropriate." (*Ibid.*)

---

[5]Such cases include *People* v. *Collins, supra,* 21 Cal.3d 208, 216-217, *People* v. *Hood, supra,* 1 Cal.3d 444, 459, *Henderson, supra,* 60 Cal.2d 482, 496-497, *People* v. *Pettaway*

The lead opinion's attempt to cabin the rationale in *Marks* founders because it fails to account for the *Marks* decision's emphasis on the fact the jury in that case found the enhancement allegation "not true," and *Marks*'s characterization of this finding as an "acquittal." The concept of an acquittal clearly implicates the historic constitutional double jeopardy bar to retrial. Indeed, if the federal double jeopardy clause protects against anything, it "protects against a second prosecution for the same offense *after acquittal*." (*North Carolina* v. *Pearce, supra,* 395 U.S. 711, 717 [89 S.Ct. 2072, 2076], italics added, fn. omitted.) "[I]t has long been settled under the Fifth Amendment that a verdict of *acquittal* is final, ending a defendant's jeopardy . . . ." (*Green* v. *United States, supra,* 355 U.S. at p. 188 [78 S.Ct. at pp. 223-224], italics added.) By emphasizing the jury found the enhancement allegation "not true" and characterizing the finding as an "acquittal," the *Marks* court was clearly invoking this "long-settled" constitutional doctrine.

Moreover, the *Henderson-Collins-Hood* line of cases (see fn. 5, *ante*) cited in *Marks,* does not prohibit any retrial at all, but merely limits the aggregate sentence to no more than was achieved in the first trial. Thus, in *Henderson, supra,* 60 Cal.2d 482, where the defendant was sentenced to life imprisonment following his first trial, we did not purport to prevent any retrial whatsoever; we merely held he could not be given the greater sentence of the death penalty following retrial. Invoking the same rule in *People* v. *Hood, supra,* 1 Cal.3d 444, we permitted a retrial but limited the aggregate sentence to that achieved in the first trial. (*Id.* at p. 459.) If, as suggested by the lead opinion, *Marks* was based solely on the state constitutional right against imposition of a greater sentence on retrial following a successful appeal, the *Marks* opinion should have permitted a retrial. Instead, *Marks* concluded "[t]he jury's rejection [of the enhancement] constituted an express acquittal on the enhancement and *forecloses any retrial*." (*Marks, supra,* 1 Cal.4th at p. 78, fn. 22, italics added.) The lead opinion's belated attempt to redefine the meaning of *Marks* is thus unpersuasive.

Moreover, the lead opinion's restrictive reading of the double jeopardy clause of the California Constitution fails to address the following authorities, which pose analogous sentence enhancements and conclude double jeopardy applies: *People* v. *Brookins* (1989) 215 Cal.App.3d 1297, 1309 [264 Cal.Rptr. 240] (double jeopardy precludes retrial of Penal Code section 667.7 habitual offender enhancement because it was reversed for insufficient evidence); *People* v. *Pettaway, supra,* 206 Cal.App.3d at page 1332, reversed on other grounds *sub nom., Pettaway* v. *Plummer* (9th Cir. 1991) 943 F.2d 1041 (state constitutional double jeopardy provision prohibits retrial of Penal

(1988) 206 Cal.App.3d 1312, 1331-1332 [254 Cal.Rptr. 436], and *People* v. *Asbury* (1985) 173 Cal.App.3d 362, 366 [218 Cal.Rptr. 902].

Code section 12022.5 [personal firearm use] and Penal Code section 12022.7 [personal infliction of great bodily injury] enhancements following jury verdict enhancements were "not true" as to murder charge); *People* v. *Jones* (1988) 203 Cal.App.3d 456, 460 [249 Cal.Rptr. 840], disapproved on another point, *People* v. *Tenner, supra,* 6 Cal.4th at page 566, footnote 2 (double jeopardy precludes retrial of Penal Code section 667.5 prior felony conviction enhancement); *People* v. *Raby* (1986) 179 Cal.App.3d 577, 591 [224 Cal.Rptr. 576] (double jeopardy precludes retrial of prior felony enhancement); and *People* v. *Bonner* (1979) 97 Cal.App.3d 573, 575 [158 Cal.Rptr. 821] (double jeopardy prohibits reprosecution of narcotics weight enhancement allegation following appellate reversal for insufficient evidence); see also *People* v. *Guillen* (1994) 25 Cal.App.4th 756 [31 Cal.Rptr.2d 653] (reaffirming *Bonner,* but finding mistrial on weight enhancement does not preclude retrial); *People* v. *Reynolds* (1989) 211 Cal.App.3d 382, 390 [259 Cal.Rptr. 352] (double jeopardy does not prevent retrial of serious felony enhancement under Penal Code section 667 because it was reversed for trial error and not for insufficient evidence).

It bears repeating that "the double jeopardy clause is no mere 'technicality'; it is an integral part of 'the framework of procedural protections which the Constitution establishes for the conduct of a criminal trial.' (*United States* v. *Jorn* [(1971)] 400 U.S. [470,] 479 [91 S.Ct. 547, 554, 27 L.Ed.2d 543, 553] (plur. opn.).) Effectuating the spirit as well as the letter of its liberality, courts have 'disparaged "rigid, mechanical" rules in [its] interpretation . . . . [Citation.]' (*Serfass* v. *United States* [(1975)] 420 U.S. [377,] 390 [95 S.Ct. 1055, 1063-1064, 43 L.Ed.2d 265, 267].) In animating our own independent 'vital safeguard,' we have expressly refused to perpetuate 'spurious distinction[s]' at the risk of 'giving our constitutional prohibition against twice in jeopardy a "narrow, grudging application" unsupported by either logic or reason.' (*Gomez* v. *Superior Court* [(1958)] 50 Cal.2d [640,] 649 [328 P.2d 976] . . . .)" (*Marks, supra,* 1 Cal.4th at pp. 78-79.)

Perhaps a bit uncomfortable with its decision—understandably, since the specter of a defendant being retried innumerable times on the same allegations until the People finally succeed in proving them true is indeed disturbing—the lead opinion concludes by detailing a long list of what it is not deciding. It explains that although the People are not prohibited by double jeopardy principles from retrying the prior felony conviction enhancement, other limits might curtail the ability of the People on retrial to obtain a true finding. The lead opinion opines, for example, that on retrial the People cannot rely solely on the same evidence as initially presented, for even if the bedrock principle of double jeopardy does not apply to bar retrial, the more amorphous prudential principles of law of the case will apply. The lead

opinion, although it declines to elaborate, also suggests unspecified limitations might restrict such required additional evidence. Similarly, the lead opinion hints there may be due process limits in such a retrial. (Lead opn., *ante*, at p. 845.) One can only guess what these intimations mean for future cases; what is clear is that for this defendant, on the facts of this particular case, retrial following acquittal is permitted.

Such legal contortions are unnecessary. Not only does this court have a long history of relying on the state constitutional double jeopardy clause rather than its federal counterpart, there is in this state an unbroken line of cases applying the double jeopardy principles to noncapital sentence enhancement allegations. The majority breaks from this history without persuasive reasons for doing so. Accordingly, I would find the Court of Appeal's decision that the People adduced insufficient evidence to prove the enhancement alleged pursuant to Penal Code sections 667, subdivisions (b)-(i) and 1170.12, subdivisions (a)-(d), prohibits retrial of the same enhancement allegation pursuant to article I, section 15 of the California Constitution. The People having had one good chance to prove the truth of the prior conviction allegation, they should now be barred by the state constitutional double jeopardy clause from a second chance to prove the same charge.

### CONCLUSION

The lead opinion twice mentions the ease with which the People can prove a prior felony conviction such that it may be used to increase an offender's sentence: "a prior conviction trial," we are told, "is simple and straightforward," and "the outcome is relatively predictable." (Lead opn., *ante*, at p. 838.) And again, repeating itself, the lead opinion declaims: "[T]rial of a prior conviction allegation is relatively perfunctory, and the outcome is usually predictable." (*Id.* at p. 845.) I agree. Under such circumstances, I see no reason to do violence to double jeopardy principles merely to permit the People multiple opportunities to prove the existence of such prior convictions. I dissent.

Mosk, J., and Kennard, J., concurred.

The United States Supreme Court granted a petition for a writ of certiorari on January 16, 1998 (No. 97-6146), limited to the question whether the Double Jeopardy Clause applies to noncapital sentencing proceedings that have the hallmarks of a trial on guilt or innocence.